366 S.E.2d 117

**Charles D. MARANO**

v.

**Manfred HOLLAND, Warden, West Virginia Penitentiary.**

No. 17434.

Supreme Court of Appeals of West Virginia.

Feb. 1, 1988.

**160**

Geary M. Battistelli, Wheeling, for plaintiff.

Charles G. Brown, Atty. Gen., Silas B. Taylor, Deputy Atty. Gen., for defendant.

MILLER, Justice:

The State appeals an order of the Circuit Court of Ohio County which granted habeas corpus relief to the defendant, Charles D. Marano, by setting aside his conviction for first degree murder.[1] The court, in its order, relied principally upon two grounds: (1) the compulsory production of papers delivered by the defendant to psychiatrists retained by his attorney, in violation of the Fourth, Fifth, and Sixth Amendments, and (2) ineffective assistance of counsel in violation of the Sixth Amendment. We conclude that there was constitutional error, and substantially affirm the judgment. However, we reverse insofar as the order required retrial within ninety days, and remand for entry of an appropriate order.

## I.

## FACTS

### A. The Criminal Trial

On October 11, 1983, at an automobile body shop in Ohio County, West Virginia, the defendant killed Gregory Jay Dean with multiple shotgun blasts. It was contended the shooting occurred after the defendant learned that Mr. Dean, his best friend and business partner, was romantically involved with his wife. The defendant was indicted for murder and tried in the Circuit Court of Ohio County in March, 1984.

The State presented uncontroverted evidence which detailed the circumstances of the shooting and its aftermath. Robert Weisehaudt, an eyewitness, lived next to the body shop which was jointly operated by Mr. Dean and the defendant. At approximately 12:30 p.m. on the day of the shooting, Mr. Weisehaudt heard a gunshot and walked to a vantage point 100 yards from the body shop. He observed the two men running and shouting outside of the shop. The defendant was armed with a shotgun. As the defendant began to move toward Mr. Dean, he pointed the gun toward Mr. Dean's lower body and said: "Suffer, you son-of-a-bitch, like me." He discharged his weapon and Mr. Weisehaudt immediately summoned the police.

Shortly after the shooting, the defendant made two non-custodial confessions which were admitted at trial. At 12:55 p.m., he placed a call to the Wheeling police department and reported to the desk sergeant: "I just shot somebody here for f—king my wife." He also described where the shooting had taken place and named Mr. Dean as the victim. Minutes later, while awaiting the arrival of the police, the defendant answered a telephone call at the shop. When the caller inquired as to the whereabouts of Mr. Dean, the defendant replied: "I just killed him. He's f—king my wife."

The defendant utilized an insanity defense and presented three psychological experts, all of whom agreed he was not criminally responsible under *State v. Myers*, 159 W.Va. 353, 222 S.E.2d 300 (1976).[2] Their testimony tended to portray the defendant as an emotionally fragile man who was heavily dependent upon family relation-

---

**1.** It should be noted that trial counsel appealed the conviction to this Court, which refused the petition for appeal on January 16, 1985.

**2.** We held in Syllabus Point 2, in part, of *Myers:* "When a defendant in a criminal case raises the issue of insanity, the test of his responsibility for his act is whether, at the time of the commission of the act, it was the result of a mental disease or defect causing the accused to lack the capacity either to appreciate the wrongfulness of his act or to conform his act to the requirements of the law...."

ships. His friendship with Mr. Dean was very close, and was analogized to the relationship between father and son. The defendant viewed his wife, Sherry, as his "dream girl," and their marriage was said to partake of an almost "fairy tale" quality. For a variety of reasons, however, the marriage began to disintegrate. His wife sued for divorce, and the two were separated in February, 1983. Though the defendant repeatedly attempted reconciliation, he was unsuccessful.

Thereafter, in an effort to secure evidence of suspected infidelity, the defendant began to surreptitiously tape record his wife's telephone conversations. Two days prior to the killing, he listened to one of the tapes and learned his wife was having a number of extramarital relationships. He became quite upset and apparently sought assistance at a mental health facility, though he did not receive treatment. Two days later, he retrieved additional tapes. These tapes disclosed that his wife had had a sexual liaison with Mr. Dean and, further, that they planned to rendezvous that very day.

The thrust of the defendant's insanity theory was that the tapes acted to precipitate the killing. His psychologists testified that, after he heard the tapes, the defendant claimed to have experienced auditory hallucinations which he believed to be the voice of God. He was commanded to kill Mr. Dean, and honestly believed he was carrying out the will of God when he did so. The defense psychologists were, therefore, of the view that he lacked the capacity to appreciate the wrongfulness of the killing.

The State, on rebuttal, called a psychologist who had examined the defendant prior to trial and was privy to papers provided by the defendant to his own psychologists. It was her opinion that the defendant suffered a major depressive disorder, but was not psychotic. She concluded that the defendant had the ability to appreciate the criminality of his conduct. However, the question of whether he was able to con-

form his conduct to the law was, in her words, one "for the jury." On March 31, 1984, the jury returned a verdict of guilty of first degree murder with a recommendation of mercy.

### B. Habeas Proceeding

The defendant petitioned pro se for a writ of habeas corpus in October, 1985, and counsel was appointed to represent him. An evidentiary hearing was held before a special judge on July 14, 1986.[3] The amended petition cited two major grounds for relief. First, it alleged that the representation of trial counsel had been so ineffective as to violate the Sixth Amendment. Second, it alleged a violation of the Fourth, Fifth and Sixth Amendments as a result of the production, by court order, of documents which had been provided by defendant to his psychiatric experts in preparation for his defense.

The defendant submitted a lengthy affidavit and presented oral testimony at the hearing. The defendant's trial counsel and one of the State's attorneys also appeared as witnesses. After the testimony had ended, the special judge orally granted habeas relief. He determined on various grounds that the court's production order was constitutionally infirm. He also concluded that trial counsel's representation had been deficient in numerous respects. He emphasized primarily counsel's decision not to introduce the tape recordings of the wife in support of the proffered insanity defense. An order granting relief and requiring retrial within ninety days was entered on July 24, 1986. This appeal followed.

### II.

### COURT'S PRODUCTION ORDER

At a pretrial conference on March 12, 1984, the State moved pursuant to Rule 16(b), W.Va.R.Cr.P., to require the production of all papers upon which the defense psychologists had relied in their evaluations of the defendant. After a short discussion, the court denied the State's motion. However, to provide an opportunity

---

**3.** On June 12, 1986, the case was assigned to a special judge by administrative order of this Court due to the voluntary recusal of all circuit judges in Ohio County.

for the State to conduct a comparable mental examination, the court further ruled that all such papers be made available directly to the State's psychologist. As authority for its ruling, the court cited two cases, *State v. Jackson,* 171 W.Va. 329, 298 S.E.2d 866 (1982), and *State v. Simmons,* 172 W.Va. 590, 309 S.E.2d 89 (1983), as well as W.Va.Code, 27–3–1.[4]

An order dated March 20, 1984, outlined the proposed procedure for production of the defense documents. It consisted of three major steps. First, the papers were to be delivered to the State's psychologist in a sealed box. Second, the State's attorneys were not permitted to inspect the papers, and the psychologist was instructed not to refer to the contents of the papers in any report she might prepare for the State. Third, the box was to be resealed and returned to the defendant after the inspection was completed. The defendant objected to the order, but produced the papers as required. So far as the record reveals, the State faithfully complied with the procedure.

The sealed papers were made available to the State's attorney for review only after the lead defense psychologist had testified on direct examination. He did not specifically refer to these materials in his testimony. One of the documents produced by the defendant was a 10–page autobiography, captioned "My Life With Sherry," which had been prepared by the defendant at the request of counsel. Also produced were pages of a diary handwritten by the defendant's mother.

After the papers had been reviewed by the State, two areas were developed in cross-examination of each of the defense psychologists. First, the autobiography referred to one or more episodes of mutual infidelity, or "wife swapping," in which the defendant had participated. Second, a diary entry suggested the defendant knew of his wife's relationship with Mr. Dean months in advance of the shooting.

The State vigorously cross-examined the psychologists as to whether they had considered the information contained in the papers in arriving at their opinions on the defendant's insanity. Each witness indicated that the information had not affected his opinion. The papers were not introduced by either party. The State in its closing argument used the wife swapping incidents to undermine the defendant's insanity claim. It pointed out that the claim was predicated on the destruction of the defendant's loving relationship with his wife, but questioned how this could be when he acknowledged the wife swapping incidents.

 Initially, we note that the court at the criminal trial was correct in holding that these documents could not be discovered under Rule 16(b), W.Va.R.Cr.P. The State's right to request discovery from the defendant is triggered only if the defendant initially seeks discovery, and is confined to the particular area in which the defendant has sought discovery.[5] Addi-

---

**4.** W.Va.Code, 27–3–1, provides for confidentiality of certain communications given by a patient or his family in regard to mental health diagnosis or treatment. Under subsection (b), such confidential information may be disclosed in five enumerated instances. The one that appears to have been relied upon by the trial court is (b)(3):

 "Confidential information may be disclosed:

 * * * * * *

 "(3) Pursuant to an order of any court based upon a finding that said information is sufficiently relevant to a proceeding before the court to outweigh the importance of maintaining the confidentiality established by this section."

As we discuss *infra* in the text, these statutory provisions may be required to yield in the face of constitutional commands. In *State v. All-*man, 177 W.Va. 365, 369, 352 S.E.2d 116, 119 (1986), although not constitutionally grounded, we concluded that a defendant could require disclosure of psychiatric records of the chief prosecution witness to determine at an *in camera* hearing if the records would affect the witness's credibility. *See also Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

**5.** Typical of the reciprocity language is Rule 16(b)(1)(A):

 "Documents and Tangible Objects.—If the defendant requests disclosure under subdivisions (a)(1)(C) or (D) of this rule, upon compliance with such request by the state, the defendant, on request of the state, shall permit the state to inspect and copy or photograph books, papers, documents, photo-

tionally, the State must have complied with the defendant's initial discovery request before it can request discovery. The defendant had not sought documents under Rule 16(a)(1)(C); therefore, the State could not obtain documents in the defendant's possession pursuant to Rule 16(b)(1)(A). *See* I F. Cleckley, Handbook on West Virginia Criminal Procedure 539-40 (1984).

Although the court relied on *State v. Jackson, supra,* and *State v. Simmons, supra,* to support its ruling, as does the State in this habeas appeal, we do not believe these cases are helpful. *Jackson* dealt with Fifth Amendment safeguards surrounding the defendant's statements at a court-ordered mental examination. It cannot be read as authority for the right of the State to obtain an order to compel the disclosure of documents voluntarily provided by the defendant to his own psychologists.

Nor does *Simmons* support the State's position. In *Simmons* we addressed the question of whether a State psychiatrist had violated the confidentiality provisions of W.Va.Code, 27-3-1, when he obtained the defendant's medical record through his association with the same clinic as the defendant's psychiatrist. We made this statement in *Simmons,* 172 W.Va. at 598, 309 S.E.2d at 97, which may have led the trial court to conclude that production was authorized:

> "[A]ccess to records held by a third party can be obtained under W.Va.Code, 27-3-1(b)(3), which permits a court to order production of such material if it finds 'that said information is sufficiently relevant to a proceeding before the court to outweigh the importance of maintaining the confidentiality established by this section.'"

In *Simmons,* there was no court order compelling disclosure of communications made by the defendant to his retained psychologist. Consequently, we had no occasion to consider the constitutional implications of W.Va.Code, 27-3-1(b)(3).[6] These constitutional issues are discussed in the following sections, where we conclude that the court's production order violated the defendant's Fourth Amendment protection against unreasonable searches and seizures, but not his Fifth Amendment privilege against self-incrimination nor his Sixth Amendment right to counsel.

### A. Fourth Amendment

The Fourth Amendment provides protection against "unreasonable searches and seizures" by the government. U.S. Const. amend. IV.[7] It has been stated that "the principal object of the Fourth Amendment is the protection of privacy[.]" *Warden v. Hayden,* 387 U.S. 294, 304, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782, 790 (1967). We adopted this same position in Syllabus Point 7 of *State v. Peacher,* 167 W.Va. 540, 280 S.E.2d 559 (1981):

> "The Fourth Amendment of the *United States Constitution,* and Article III, Section 6, of the *West Virginia Constitution* protect an individual's reasonable expectation of privacy."

At the threshold, then, one who asserts a Fourth Amendment violation must demonstrate a "reasonable expectation of privacy" in the subject of the seizure. That expectation is to be measured both subjectively and by an objective standard of reasonableness. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *See also, United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1974); 1 W. LaFave, *Search and Seizure* § 2.1(c) (2d ed. 1987).

---

graphs, tangible objects or copies or portions thereof, which are within the possession, custody or control of the defendant and which the defendant intends to introduce as evidence in chief at the trial."

**6.** For the text of W.Va.Code, 27-3-1(b)(3), *see* note 4, *supra.*

**7.** The precise language of the Fourth Amendment is:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
Similar language is contained in W.Va. Const. art. III, § 6.

■ We are satisfied upon our review of the record the defendant had a reasonable expectation that his papers would remain private. The defendant was asked by his counsel to prepare and deliver to defense-retained psychologists the autobiographical material which chronicled his relationship with his wife and disclosed the incidents of wife swapping.[8] Most courts consider conversation or material delivered by the defendant, at his attorney's direction, to a psychiatric expert retained by the attorney in preparation for a mental defense to be within the attorney-client privilege.[9] We concur in this position and find that it creates a reasonable expectation of privacy for Fourth Amendment purposes. *Cf. DeMassa v. Nunez*, 770 F.2d 1505 (9th Cir.1985) (attorney-client privilege confers expectation of privacy in confidential communications to attorney). We thus turn to the merits of the Fourth Amendment claim.

■ In its earlier analysis of compulsory production issues, the United States Supreme Court utilized a self-incrimination approach under the Fourth Amendment much as under the Fifth Amendment. *E.g., Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). *Boyd* and its progeny has, however, been substantially modified by *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), and *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627

(1976), in which the Court concluded that the Fifth Amendment was not implicated by seizure of business documents. In *Andresen,* the seized documents had been voluntarily prepared by an attorney and were introduced at trial by a handwriting expert who authenticated them. *Andresen* relied on language in *Fisher* which emphasized that the two Amendments protect distinct types of interests: the Fourth Amendment protects "personal privacy," while the Fifth Amendment bars "compelled self-incrimination." 425 U.S. at 400–01, 96 S.Ct. at 1576, 48 L.Ed.2d at 50. Thus, for Fourth Amendment purposes, the fact that a document compelled to be produced may be self-incriminating is ordinarily of no consequence.[10]

Both *Fisher* and *Andresen,* in rejecting any self-incrimination overlay in Fourth Amendment seizure cases, relied on *Warden v. Hayden, supra.* In *Hayden,* the Supreme Court reversed long-standing precedent which held seizures to be permissible under the Fourth Amendment only if they involved contraband, instrumentalities, and fruits of a crime.[11] The *Hayden* Court concluded that any relevant evidentiary material could be seized. However, it went on to state that there must be a link between the evidence to be seized and the criminal conduct investigated:

"There must, of course, be a nexus—automatically provided in the case of fruits, instrumentalities, and contra-

8. We do not consider whether the diary extracts turned over to the defense psychologists were subject to Fourth Amendment protection on behalf of the defendant, simply because there is an insufficient fact record to make a determination of the defendant's reasonable expectation of privacy and his standing to claim a Fourth Amendment violation.

9. *E.g., United States v. Alvarez,* 519 F.2d 1036 (3d Cir.1975); *United States ex rel. Edney v. Smith,* 425 F.Supp. 1038 (E.D.N.Y.1976), *aff'd,* 556 F.2d 556 (2d Cir.), *cert. denied,* 431 U.S. 958, 97 S.Ct. 2683, 53 L.Ed.2d 276 (1977); *San Francisco v. Superior Court,* 37 Cal.2d 227, 231 P.2d 26 (1951); *State v. Toste,* 178 Conn. 626, 424 A.2d 293 (1979); *Pouncy v. State,* 353 So.2d 640 (Fla.App.1977); *State v. Pratt,* 284 Md. 516, 398 A.2d 421 (1979); *contra People v. Edney,* 39 N.Y.2d 620, 384 N.Y.S.2d 23, 350 N.E.2d 400 (1976).

10. In note 11 of *Fisher,* the Supreme Court recognized that where "the Government has compelled the subpoenaed person to write the document," the Fifth Amendment privilege against self-incrimination would be violated. 425 U.S. at 410, 96 S.Ct. at 1580, 48 L.Ed.2d at 55.

11. Under this law, as reflected in *Gouled v. United States,* 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), seizure of mere evidentiary material was improper. This rule was traceable to the English common law of search warrants articulated in *Entrick v. Carrington,* 19 How.St. Tr. 1029 (1765). *See generally,* 1 W. LaFave, *Search and Seizure* § 2.6(d) (2d ed. 1987); I F. Cleckley, Handbook of West Virginia Rules of Criminal Procedure 289–90 (1985). The *Hayden* rule is incorporated in Rule 41(b) of the Federal Rules of Criminal Procedure, which we have adopted in Rule 41(b) of the West Virginia Rules of Criminal Procedure.

band—between the item to be seized and criminal behavior. Thus, in the case of 'mere evidence' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration of police purposes will be required." 387 U.S. at 307, 18 L.Ed.2d at 792, 87 S.Ct. at 1650.[12]

It appears that the precise question involved in this case has not been definitely resolved by the United States Supreme Court since *Hayden:* Whether and under what circumstances private papers, as distinguished from business records, can be compelled to be produced under the Fourth Amendment.[13] We need not attempt a definite answer, as the case may be resolved on less troublesome grounds.

Despite the lack of any direct guidance, it cannot be doubted that the United States Supreme Court would assert Fourth Amendment protection simply because it has done so in cases involving less intrusive acts by those who, while acting in a governmental capacity, were not in the role of law enforcement. In *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), Fourth Amendment protection was found to exist where government hospital security officers made a warrantless search of an employee's office desk and file cabinet.

The Supreme Court in *O'Connor* placed considerable reliance on *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), which had extended Fourth Amendment protection to the search of a student's purse in school. Admittedly, both *O'Connor* and *T.L.O.* extended diminished protection because probable cause was not required to execute the search and no warrant was necessitated.

However, the Court's acknowledgment in *O'Connor* of the continued vitality of *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), reinforces our conclusion that strong Fourth Amendment interests are involved in this case. In *Mancusi,* a union official was convicted in a state court of conspiracy, coercion, and extortion in reliance upon records seized from his office by law enforcement officers. After unsuccessful appeals, he sought and obtained habeas corpus relief on the basis of a claimed Fourth Amendment violation. The Supreme Court affirmed, and concluded that the defendant had a reasonable expectation of privacy in the papers contained in his office even though it was shared with several other union officials.

Of particular interest in *Mancusi* was that the inculpatory material had been seized under the purported authority of a subpoena duces tecum issued by the State's attorney. The Supreme Court concluded that the subpoena could not be equated with a warrant, which is issued by a neutral and detached magistrate upon a showing of probable cause.[14] It concluded that

---

**12.** In *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), part of the Court's division was over the degree of proof necessary to establish probable cause for the issuance of the warrant. *See* Stevens, J., dissenting.

**13.** One leading commentator summarizes the issue as follows:

"But what of the Fourth Amendment? It *is* concerned with privacy; as the Court stressed in *Warden v. Hayden,* 'the principal object of the Fourth Amendment is the protection of privacy.' 'Diaries and personal letters that record only their author's personal thoughts lie at the heart of our sense of privacy,' and thus it is not fanciful to suggest that perhaps private papers of that particular type are absolutely protected by the Fourth Amendment from seizure. The fundamental and difficult policy question is whether certain aspects of

our privacy are so precious that the privacy interest can be said *never* to be outweighed by a law enforcement interest, so that there is absolute immunity from seizure of certain highly personal documents, or whether all aspects of our privacy must be balanced against the needs of law enforcement pursuant to the traditional probable cause and particularity requirements of the Fourth Amendment. This question was neither raised nor resolved in *Andresen."* 1 W. LaFave, *Search and Seizure* § 2.6(e) at 496 (2d ed. 1987). (Emphasis in original; footnotes omitted).

**14.** While the papers in this case were obtained by means of a court order upon motion of the State, the process is analogous to the issuance of a subpoena duces tecum in that a subpoena may be enforced by court order. Rule 17(c), W.Va. R.Cr.P. *See, e.g., Boyd v. United States, supra* (lower court order to enforce administrative

there was, in effect, a warrantless search which was unreasonable for purposes of the Fourth Amendment.[15]

In the present case, a related defect exists. There was an absence of any probable cause which would justify the issuance of the order.[16] We believe that as an absolute minimum, the Fourth Amendment demands that a criminal defendant's private papers, in which there has been found to exist a reasonable expectation of privacy, cannot be seized by law enforcement officials in the absence of a valid warrant issued upon probable cause.[17] As a consequence, we find the production order to be invalid.

We do not believe the fact that the autobiography was not introduced into evidence would cure the Fourth Amendment

violation. It is generally recognized that a witness's testimony which is obtained or substantially influenced by materials seized in violation of the Fourth Amendment may also be suppressed under *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). It is true that *Ceccolini* did not espouse a per se exclusionary rule. However, it did recognize that where there is a direct connection between the illegally obtained evidence and the witness, then testimony by the witness is not admissible.[18]

Following *Ceccolini,* courts have tended to stress that if the witness's testimony has been induced as a result of the illegal search, then it is inadmissible. *E.g., United States v. Scios,* 590 F.2d 956, 191 U.S.App.D.C. 254 (D.C.Cir.1978); *United*

subpoena treated as subpoena for Fourth Amendment analysis). We note also *Oklahoma Press Pub. Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed.2d 614 (1946), which established general guidelines on administrative subpoenas, but do not believe it is helpful in the resolution of this case.

**15.** In the area of Internal Revenue summonses, independently of constitutional grounds, the Supreme Court has held that the statute authorizing their issuance cannot be interpreted to authorize a subpoena duces tecum where the sole object is to aid a criminal tax case. *United States v. LaSalle Nat'l Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978). On the other hand, the United States Supreme Court has concluded that insofar as grand jury subpoenas are concerned, the Fourth Amendment exclusionary rule does not apply. Consequently, a grand jury can consider evidence obtained through an illegal search and seizure. *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

**16.** The prosecuting attorney argued that production of the material would provide a fairer balance between the State and defense experts. This is not a probable cause argument, but a veiled attempt to require the defendant to help the State's psychologist. We agree with the Maryland Supreme Court's remarks in *State v. Pratt,* 284 Md. at 524, 398 A.2d at 425, that such a rule would require "the defense, in essence, ... to assist the prosecution in discharging its burden of proof.... [O]nce the sanity of the accused has been placed in doubt by the defense, [the State] is also saddled with the ultimate burden of proving, beyond a reasonable doubt, that the defendant was sane at the time he committed the act."

**17.** It is clear that the State cannot cure the Fourth Amendment violation by seeking this same material by a new warrant, as the probable cause would be based on information obtained from the prior illegal seizure. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed.2d 319 (1920); 4 W. LaFave, *Search & Seizures* § 11.4(f) (2d ed. 1987). Furthermore, at any retrial, the State's psychologist would not be able to testify about the defendant's autobiographical material.

**18.** The *Ceccolini* opinion specifically rejected a per se exclusionary rule. It instead recognized that live witness testimony may be so attenuated from the illegal search or seizure as to dissipate the taint:

"Even in situations where the exclusionary rule is plainly applicable, we have declined to adopt a 'per se or "but for" rule' that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest. *Brown v. Illinois,* 422 U.S. 590, 603, 45 L.Ed.2d 416, 95 S.Ct. 2254 (1975).

"Evaluating the standards for application of the exclusionary rule to live-witness testimony in light of this balance, we are ... impelled to conclude that the degree of free will exercised by the witness is not irrelevant in determining the extent to which the basic purpose of the exclusionary rule will be advanced by its application. This is certainly true when the challenged statements are made by a putative defendant after arrest, *Wong Sun [v. United States,* 371 U.S. 471], at 491, 9 L.Ed.2d 441, 83 S.Ct. 407 [at 419] [ (1963) ]; *Brown v. Illinois, supra,* and a fortiori is true of testimony given by nondefendants." 435 U.S. at 276–77, 98 S.Ct. at 1060, 55 L.Ed.2d at 277.

*States v. Cruz,* 581 F.2d 535 (5th Cir.1978); *United States v. Rubalcava–Montoya,* 597 F.2d 140 (9th Cir.1978); *People v. Superior Court,* 31 Cal.3d 883, 185 Cal.Rptr. 113, 649 P.2d 696 (1982); *see generally* 4 W. LaFave, *Search and Seizure* § 11.4(i) (2d ed. 1987). Here the defense psychologists' testimony was induced through cross-examination by the prosecuting attorney who utilized the illegally obtained evidence in questioning them. In so doing, the facts surrounding the defendant's wife swapping were brought before the jury. As we have earlier indicated, this was done in order to undermine the defendant's insanity defense.

■ It remains to inquire whether the error in this case was harmless. The rule of harmless constitutional error, as announced originally in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), was summarized in Syllabus Point 5 of *State v. Boyd,* 160 W.Va. 234, 233 S.E.2d 710 (1977):

" 'Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt.' Syllabus Point 5, *State ex rel. Grob v. Blair,* [158] W.Va. [647], 214 S.E.2d 330 (1975)."

■ Although the evidence against the defendant was quite substantial, we cannot say beyond a reasonable doubt that the State's use of the illegally seized evidence in its examination of witnesses and argument before the jury did not impact adversely upon the defendant's insanity defense. It is clear that, but for the improper production order, the information relied upon by the State's attorney would not have come into the State's hands.[19] One of the dominant themes developed by the State—that the defendant had been involved in wife swapping—traced its origin directly to the papers. This theme was employed repeatedly to counter the claim that the defendant's sudden discovery of

his wife's infidelity triggered his insanity. It formed an integral part of the State's closing argument and seriously undermined the defendant's sole theory of defense.

Other jurisdictions have declined to hold evidentiary errors to be harmless where the potential impact upon an insanity defense was substantial. *E.g., White v. State,* 448 So.2d 970 (Ala.Crim.App.1984) (improper questioning which disclosed results of prior hospitalization adverse to insanity theory); *People v. Cole,* 382 Mich. 695, 172 N.W.2d 354 (1969) (inadequate foundation for state witnesses on insanity issues); *Commonwealth v. Hale,* 467 Pa. 293, 356 A.2d 756 (1976) (testimony of State's only expert based upon interview tainted by Fifth Amendment violation); *State v. Boyd,* 692 P.2d 769 (Utah 1984) (testimony of State's psychologist based upon improper breathalyzer). We, therefore, conclude that the erroneous use of the evidence obtained in violation of the Fourth Amendment was not harmless, and that the conviction cannot be sustained.

## B. Fifth Amendment

■ The Fifth Amendment provides, in part: "No person ... shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V.[20] Historically, the Fifth Amendment privilege has been interpreted to provide protection only where incriminating evidence of a *testimonial* or communicative nature is sought from a witness through the vehicle of state *compulsion.* As the Supreme Court has phrased it: "[T]he privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature[.]" *Schmerber v. California,* 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908, 914 (1966). *See also State v. Grubbs,* 178 W.Va. 811, 364 S.E.2d 824 (1987); *State v. Harman,* 165 W.Va. 494, 270 S.E.2d 146 (1980).

**19.** The State was, of course, permitted to develop through cross-examination the data upon which the defense experts based their opinions. Rule 705, W.Va.R.Evid. There is, however, no concomitant right to compel production of such data once its identity has been disclosed.

**20.** W.Va. Const. art. III, § 5 is very similar: "No person shall ... in any criminal case, be compelled to be a witness against himself[.]"

The Fifth Amendment claim advanced by the defendant consists of two parts, which we examine separately: (1) that he was compelled by court order to produce incriminating communications made to his psychologists, and (2) that cross-examination of witnesses by the State revealed his privileged communications.

### 1.

█ It is urged initially that the order requiring the defendant to produce the autobiography and other papers provided to his psychological experts violated his Fifth Amendment privilege. We do not agree. The Fifth Amendment protects only against compelled communications. It does not extend to the *contents* of documents which are obtained by compulsory process where such documents have been voluntarily prepared.

This point was articulated in *Fisher v. United States, supra,* which involved a subpoena issued to the attorney of a taxpayer seeking production of tax work papers prepared by the taxpayer's accountants and delivered to the attorney. The Supreme Court rejected the attorney's Fifth Amendment challenge to the subpoena,[21] and held that the documents sought were neither compelled nor communicative.

"A subpoena served on a taxpayer requiring him to produce an accountant's work papers in his possession without doubt involves substantial compulsion. But it does not compel oral testimony; nor would it ordinarily compel the taxpayer to restate, repeat, or affirm the truth of the contents of the documents sought. Therefore, the Fifth Amendment would not be violated by the fact alone that the papers on their face might incriminate the taxpayer, for the privilege protects a person only against being incriminated by his own compelled testimonial communications.... [A]s far as

this record demonstrates, the preparation of all of the papers sought in these cases was wholly voluntary, and they cannot be said to contain compelled testimonial evidence, either of the taxpayers or of anyone else. The taxpayer cannot avoid compliance with the subpoena merely by asserting that the item of evidence which he is required to produce contains incriminating writing, whether his own or that of someone else." 425 U.S. at 409–10, 96 S.Ct. at 1580–81, 48 L.Ed.2d at 55. (Citations and footnotes omitted).

█ As *Fisher* explains, no Fifth Amendment right is implicated merely by the inculpatory nature of documents which are subject to production inasmuch as their contents were not created under any compulsion.[22] Thus, so far as the defendant argues that the contents of the papers produced by him were incriminating, his Fifth Amendment claim is without merit.

█ The *Fisher* Court recognized, however, that the very *act* of producing documents in response to a subpoena may involve aspects of communication. The act of production impliedly acknowledges (1) the existence of the subpoenaed documents, (2) possession of the documents by the defendant, and (3) the defendant's belief that the documents produced are those sought. Such tacit admissions may rise to the level of Fifth Amendment protection where they are incriminating.

In *Fisher,* no self-incrimination was found because the papers subject to the subpoena had been prepared by the taxpayer's accountant. Consequently, a tacit admission could not be connected to the taxpayer since he "did not prepare the papers and could not vouch for their accuracy. The documents would not be admissible in evidence against the taxpayer without authenticating testimony. Without more, re-

---

**21.** In *Fisher,* the Supreme Court recognized that delivery of the material to the attorney did not preclude the assertion of a Fifth Amendment claim. It also recognized that the attorney-client privilege would be applicable: "*'When the client himself would be privileged* from production of the document, either as a party at common law ... or as exempt from self-incrimination, the attorney having possession of the doc-

ument is not bound to produce.' 8 J. Wigmore, § 2307, p. 592." 425 U.S. at 404, 96 S.Ct. at 1578, 48 L.Ed.2d at 52. (Emphasis in original).

**22.** Where the document itself is the result of governmental compulsion, the Fifth Amendment would come into play. *See* note 10, *supra.*

sponding to the subpoena in the circumstances ... would not appear to represent a substantial threat of self-incrimination." 425 U.S. at 413, 96 S.Ct. at 1582, 48 L.Ed.2d at 57.

■ Following *Fisher,* the Supreme Court decided *United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), which affirmed a lower court order quashing a subpoena for business records kept by a sole proprietor. The Court in *Doe* did not provide any substantial elaboration on *Fisher*'s tacit admission rule as constituting testimonial self-incrimination. It concluded that where papers had been prepared by a person subject to a subpoena duces tecum, the possibility of testimonial self-incrimination existed if production of the papers authenticated them sufficiently to make them admissible in evidence.[23]

■ Thus, under the principles expressed in *Fisher* and *Doe,* the order of production was violative of the Fifth Amendment only if the act of producing the papers was incriminating. Here, the papers sought to be produced were wholly unrelated to the primary question of guilt or innocence. They were not admitted at trial and, consequently, the issue of their existence, custody, and authenticity was irrelevant. We, therefore, hold that the production order did not violate the defendant's Fifth Amendment privilege against self-incrimination.

### 2.

The defendant argues alternatively that the State violated his Fifth Amendment privilege by cross-examining the defense psychologists regarding his participation in wife swapping. For purposes of his alternative argument, the defendant does not object to the production of the papers, but to the State's use of his communications in its interrogation of witnesses.

We are referred by the parties to *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), in which a defendant in a murder case was required to undergo a psychological examination to assess his competency to stand trial. He was determined to be competent, and was subsequently tried and convicted by a jury. At the penalty phase of trial, the psychologist who had conducted the competency examination was called to testify. He relied in part upon the results of the pre-trial examination, and concluded that the defendant posed a danger to the community. The Supreme Court reversed, and held that the communications made by the defendant during the court-ordered mental examination were privileged.

Of more relevance is the recent case of *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), where the defendant raised a "mental status" defense to a murder charge under Kentucky law.[24] His sole witness was a social worker who, in her direct testimony, read from several psychological papers and reports in the custody of the Kentucky Department of Human Services. This information bore upon the defendant's poor mental condition. On cross-examination, the State's attorney had the witness read portions of a report from

**23.** In note 13 of *Doe,* the Court made these remarks:

"Respondent did not concede in the District Court that the records listed in the subpoena actually existed or were in his possession. Respondent argued that by producing the records, he would tacitly admit their existence and his possession. Respondent also pointed out that if the Government obtained the documents from another source, it would have to authenticate them before they would be admissible at trial. See Fed.Rule Evid. 901. By producing the documents, respondent would relieve the Government of the need for authentication. These allegations were sufficient to establish a valid claim of the privilege against self-incrimination. This is not to say

that the Government was foreclosed from rebutting respondent's claim by producing evidence that possession, existence, and authentication were a 'foregone conclusion.' *Fisher,* 425 U.S. at 411, 48 L.Ed.2d 39, 96 S.Ct. 1569. In this case, however, the Government failed to make such a showing." 465 U.S. at 614, 104 S.Ct. at 1243, 79 L.Ed.2d at 561.

**24.** Kentucky's "mental status" defense may be likened to the more common insanity defense. It excuses a murder which has been committed "under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse[.]" Ky.Rev.Stat. § 507.-020(1)(a).

an earlier mental examination taken with the defendant's consent. This report tended to undermine his defense by portraying the defendant as "sophisticated" and "manipulative." A Fifth Amendment challenge was made, which the Supreme Court rejected because the statements were not a result of a compelled psychiatric examination:

> "[I]f a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution." 483 U.S. at 422–423, 107 S.Ct. at 2917–18, 97 L.Ed.2d at 355.

The Court in *Buchanan* stressed that the questioned report was the product of an earlier psychiatric evaluation jointly consented to by the defendant and the State. It also pointed out that the information was obtained through cross-examination of the defendant's witness and did not relate to any inculpatory facts about the crime itself.

■ This case is controlled by *Buchanan* for two reasons. First, like statements made at an agreed-to examination, the defendant's communications *to his own psychologists* were neither actually nor presumptively compelled. It was the defendant who raised the insanity defense, and he voluntarily conferred with psychologists in aid of that defense. There is no suggestion of either improper coercion or custodial setting. In short, the statements were not the product of State compulsion.

Second, and more to the point, the disclosed communications did not in any way serve to inculpate the defendant. As was stressed above, wife swapping bore no relevance to the crime with which the defen-

dant was charged. Rather, the questions posed by the State's attorney legitimately probed the basis of the psychological testimony. Thus, for Fifth Amendment purposes, the State's use of the defendant's communications in its cross-examination of witnesses was a permissible "rebuttal purpose" under *Buchanan*.[25] *See also, Watters v. Hubbard*, 725 F.2d 381 (6th Cir. 1984); *Noggle v. Marshall*, 706 F.2d 1408 (6th Cir.), *cert. denied*, 464 U.S. 1010, 104 S.Ct. 530, 78 L.Ed.2d 712 (1983); *State v. Janis*, 356 N.W.2d 916 (S.D.1984).

### C. Attorney–Client Privilege (Sixth Amendment)

The habeas court concluded that, insofar as the production order reached material in the hands of the defense psychologists, it violated the attorney-client privilege. As we earlier pointed out, courts have concluded that where an attorney retains an expert to assist in the defense of the case and requests the client to communicate information to that expert, the attorney-client privilege generally embraces such communications.[26]

■ The habeas court seemed to be of the view that because an attorney-client privilege attached to the material delivered to the defense psychologist, the Sixth Amendment right to effective counsel was implicated. Several courts have implied that the attorney-client privilege has some connection to the Sixth Amendment right to counsel. *E.g., DeMassa v. Nunez*, 770 F.2d 1505 (9th Cir.1985); *United States v. Alvarez*, 519 F.2d 1036 (3d Cir.1975); *State v. Pratt*, 284 Md. 516, 398 A.2d 421 (1979). We decline to pursue this point as it seems somewhat obscure.[27] The privilege originated at common law, and has as its principal object the promotion of "full and frank" discourse between attorney and client so as to insure "sound legal advice or advocacy." *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584

---

**25.** It should be stressed that our finding that there was no Fifth Amendment violation does not imply that the State's questions would be admissible at retrial. They have been previously excluded under the Fourth Amendment.

**26.** *See* note 9, *supra,* and accompanying text.

**27.** Since we have found a Fourth Amendment violation, we need not decide this issue. The cases cited in the text do not hold that a Sixth Amendment right to counsel is a part of the attorney-client privilege nor do they discuss the waiver question.

(1981); *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980); *State v. Burton*, 163 W.Va. 40, 254 S.E.2d 129 (1979); 8 J. Wigmore, *Evidence* § 2290 (McNaughton rev. 1961).

 As earlier stated in our Fourth Amendment discussion, we believe that the attorney-client privilege extended to the communications between the defendant and his psychologists.[28] However, it is well-settled that the privilege may be waived if disclosure of privileged communications is made to third parties. We recognized this principle in *State v. Burton, supra*, where statements by the defendant and his attorney were made in front of third parties who later testified about them. We concluded that to be subject to the privilege, "the communication between the attorney and client must be intended to be confidential." Syllabus Point 2, in part.[29] Faithful to this rule, courts have recognized that voluntary testimony by a psychologist with regard to the privileged communications waives the privilege. It also appears that voluntary testimony as to any part of a privileged communication operates as a waiver as to all. *E.g., United States v. Alvarez, supra; State v. Kociolek*, 129 A.2d 417, 23 N.J. 400 (1957); *see generally,* 8 J. Wigmore, *Evidence* § 2327 (McNaughton rev. 1961). We thus conclude that the testimony by the defense psychologists in this case waived whatever attorney-client privilege might have attached to the communications.[30]

## III.

## INEFFECTIVE COUNSEL CLAIM

Because we have determined that the court's production order was constitutionally infirm, we do not discuss the ineffective assistance of counsel charges except as to the failure to introduce the taped conversations of Mrs. Marano and the failure to raise a diminished capacity defense, two matters which may be involved at retrial. With new counsel representing the defendant, some of the assigned errors are cured and the others are such that they may, if desired, be pursued with the trial court. This did not occur at the first trial and, as a consequence, we have an inadequate record to discuss them even if we were inclined to do so.[31]

 We have traditionally utilized Syllabus Points 19 and 21 of *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974), as our test for ineffective assistance of counsel under article III, § 14 of the West Virginia Constitution[32] as well as the Sixth Amendment to the United States Constitution:

"19. In the determination of a claim that an accused was prejudiced by ineffective assistance of counsel violative of Article III, Section 14 of the West Virginia Constitution and the Sixth Amendment to the United States Constitution, courts should measure and compare the

28. While the defendant occasionally alludes to a psychologist-patient privilege, it is apparent such a privilege cannot be asserted here. As we pointed out in *Simmons*, 172 W.Va. at 597, 309 S.E.2d at 96, the provisions in W.Va.Code, 27-3-1, only regulate confidential communications and are not the source of a general psychologist-patient privilege.

29. The full text of Syllabus Point 2 of *State v. Burton, supra* is:

"In order to assert an attorney-client privilege, three main elements must be present: (1) both parties must contemplate that the attorney-client relationship does or will exist; (2) the advice must be sought by the client from the attorney in his capacity as a legal adviser; (3) the communication between the

attorney and client must be intended to be confidential."

30. Again, we emphasize that the rejection of the claim based upon attorney-client privilege does not mean the statements can be admitted at retrial. The Fourth Amendment violation bars their admission.

31. Other errors cited by the court in its habeas order included: (1) abandonment of a motion to disqualify the Ohio County prosecutor's office; (2) prosecutorial overmatch; (3) failure to actively pursue plea bargaining; and (4) alleged conflicts of interest.

32. W.Va. Const. art. III, § 14 contains our State counterpart to the Sixth Amendment right to counsel. It provides that "[i]n all ... trials [of crimes and misdemeanors], the accused ... shall have the assistance of counsel."

questioned counsel's performance by whether he exhibited the normal and customary degree of skill possessed by attorneys who are reasonably knowledgeable of criminal law, except that proved counsel error which does not affect the outcome of the case, will be regarded as harmless error.

\* \* \*

"21. Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused."

In *State v. Watson,* 164 W.Va. 642, 652, 264 S.E.2d 628, 634 (1980), we also emphasized that "any charge of ineffectiveness of trial counsel must ultimately relate to a matter which would have affected the jury decision." Our cases thus hold that a defendant who asserts a claim of ineffective assistance of counsel must prove (1) that his legal representation was inadequate, and (2) that such inadequacy prejudiced his case. Much the same standards are found in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The point relied upon most heavily by the defendant in support of his ineffective assistance claim was trial counsel's decision not to seek admission of the tapes. It was the opinion of the habeas court that the failure to introduce the tapes "seriously jeopardized" the defendant's case, in that they would have buttressed his insanity defense and provided a basis for a backup defense of diminished capacity.[33] We disagree.

■ We observe initially that introduction of the tapes posed serious evidentiary problems. A majority of jurisdictions have held that one spouse's interception of telephone communications by the other is a violation of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, *et seq. E.g., United States v. Jones,* 542 F.2d 661 (6th Cir.1976); *United States v. Rizzo,* 583 F.2d 907 (7th Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979); *Heyman v. Heyman,* 548 F.Supp. 1041 (N.D.Ill.1982); *Gill v. Willer,* 482 F.Supp. 776 (W.D.N.Y.1980). Violation of the Act would *ipso facto* render the tapes inadmissible. 18 U.S.C. § 2515.[34]

It also cannot be doubted that the substance of the tapes was brought before the jury through the defense psychologists. Each of the psychologists adverted to the tapes in his testimony. One summarized in great detail the various subjects and tenor of the taped conversations: the promiscuity of the defendant's wife, the openness with which she discussed sexual matters, prior sexual encounters with Mr. Dean, and their planned rendezvous on the day of the

**33.** As we explained in *State v. Simmons,* 172 W.Va. at 599, 309 S.E.2d at 98, the diminished capacity defense "is designed to permit a defendant to introduce expert testimony regarding his impaired mental condition to show that he was incapable of forming a specific criminal intent."

**34.** 18 U.S.C. § 2515 reads as follows:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom *may be received in evidence* in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter [18 U.S.C.S. §§ 2510 et seq.]."

The defendant contends that even if the tapes were inadmissible, the State would have lacked standing to raise the issue in a motion to suppress. While this may be true, it does not materially aid the defendant's position. It would also have been necessary to authenticate the voices on the tapes as a condition for their admission. Rule 901, W.Va.R.Evid.; *see also, State v. Harris,* 169 W.Va. 150, 286 S.E.2d 251 (1982). This requirement would have placed the defendant in an awkward dilemma. He could, of course, have subpoenaed as witnesses any of the participants so as to provide authentication. Obviously, however, any such witness would also have had standing (as well as a strong motivation) to move to suppress the tapes. It might also have been possible for the defendant to authenticate the tapes, but only at the risk of waiving his Fifth Amendment privilege. *See Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); *Evans v. State,* 645 P.2d 155 (Alaska 1982); *State v. Hudson,* 631 S.W.2d 716 (Tenn.Crim.App.1981).

shooting. Most importantly, each expert was permitted to state his opinion that the revelations on the tapes acted to precipitate the killing, and that the defendant was not criminally responsible.

From a strategic standpoint, trial counsel could well have decided this was the best manner to bring the information before the jury. This is particularly true in view of the evidentiary problems that surrounded the introduction of the tapes, as we have set out in note 34, *supra*.[35] Furthermore, we fail to see how the introduction of the tapes would have better supported an insanity defense than the summary given by psychologists.[36]

■ The habeas court's further conclusion that the tapes would have supported a diminished capacity defense ignores the important question whether it would have been good strategy to assert such a defense with an insanity defense. In *State v. Simmons, supra,* we discussed the diminished capacity defense as a technique to undercut the element of deliberate intent in first degree murder or of malice aforethought in second degree murder. It is to be noted that we declined in *Simmons* to decide whether we approved of such a defense. Consequently, trial counsel can hardly be criticized from a legal standpoint for not pursuing the defense. Furthermore, from a practical standpoint, it would seem to be inconsistent with the strong insanity defense that was being offered. We do not find counsel to be ineffective on this issue.

**IV.**

**HABEAS RELIEF**

Although we have concluded that the habeas court was correct in its finding of a Fourth Amendment violation, we disagree with the terms of its relief order. That order required the State to retry the defendant "within ninety (90) days ... or the [defendant] shall be forthwith released and the indictment dismissed and held for naught."

■ Our decisions, as well as those of the United States Supreme Court, recognize that when relief is granted from a criminal conviction by way of habeas corpus, the State is not foreclosed from retrying the defendant on the same criminal charges. We stated the rule in Syllabus Point 3 of *Rhodes v. Leverette*, 160 W.Va. 781, 239 S.E.2d 136 (1977):

"An unconditional discharge from confinement upon the issuance of a writ of habeas corpus does not ordinarily operate to bar further prosecution under principles of double jeopardy." [37]

See also *United States v. Tateo*, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); *State ex rel. Johnson v. McKenzie*, 159 W.Va. 795, 226 S.E.2d 721 (1976); *State ex rel. Bradley v. Johnson*, 152 W.Va. 655, 166 S.E.2d 137 (1969); *State ex rel. Tune v. Thompson*, 151 W.Va. 282, 151 S.E.2d 732 (1966).

■ A court may as an incident to habeas relief mandate a short time period for furnishing a trial transcript to facilitate a criminal appeal, as indicated in Syllabus Point 5 of *State ex rel. Johnson v. McKen-*

**35.** The defendant was still married to his wife at the time of trial and invoked the spousal immunity under W.Va.Code, 57–3–3, to preclude her from testifying. There was recognition by the habeas judge that if the tapes were introduced, testimony by the wife as to their authenticity or even her extrajudicial statements on the tapes might result in a waiver of the statutory immunity. *See People v. Lankford*, 55 Cal.App.3d 203, 127 Cal.Rptr. 408 (1976); *State v. Walker*, 80 N.J. 187, 403 A.2d 1 (1979); 7 J. Wigmore, *Evidence* § 2242 (McNaughton rev. 1961). Yet, the court gave no consideration to this or the other evidentiary problems in determining

whether this was a part of a tactical decision made by defense counsel.

**36.** The tape recordings were in excess of two hours in length and the typewritten transcript comprised over sixty pages. Much of the material was of doubtful relevance to the issues raised in the criminal trial.

**37.** Retrial would be inappropriate in certain instances. *E.g., Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (evidence insufficient to support conviction); *Keller v. Ferguson*, 177 W.Va. 616, 355 S.E.2d 405 (1987) (retrial barred on double jeopardy principles).

*zie, supra.* Our general rule with regard to the outside limit for a retrial is contained in Syllabus Point 1 of *State v. Moore,* 178 W.Va. 98, 357 S.E.2d 780 (1987), we said:

"Retrial must occur within three terms after the term in which relief is granted upon habeas corpus or appellate review, subject to the statutory exceptions excusing delay under W.Va.Code, 62–3–21."

*See also State v. Bias,* 177 W.Va. 302, 352 S.E.2d 52 (1986); *State v. Gwinn,* 169 W.Va. 456, 288 S.E.2d 533 (1982).

Consequently, we believe the habeas court erred in mandating a retrial within ninety (90) days or the indictment would be dismissed.[38] It will be appropriate on remand to determine a reasonable period for retrial and not to order dismissal of the indictment. For the foregoing reasons, the case is remanded to the Circuit Court of Ohio County for entry of an appropriate order of relief.

Affirmed, in part, Reversed, in part, and Remanded With Directions.

**38.** It is unclear what the habeas court intended by the condition of dismissing the indictment. As we have indicated in *Rhodes,* retrial is not barred on habeas relief. If the indictment was dismissed, a new arrest warrant could be obtained to initiate the criminal process again.