(No. 73616

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. PAMELA J. KNUCKLES, Appellee.

*Opinion filed April 20, 1995.*

126

MILLER, J., concurring in part and dissenting in part.
HEIPLE, J., joined by BILANDIC, C.J., dissenting.

Roland W. Burris, Attorney General, of Springfield, and James E. Ryan, State's Attorney, of Wheaton (Terence M. Madsen and Arleen C. Anderson, Assistant Attorneys General, of Chicago, and Barbara A. Preiner, Assistant State's Attorney, of counsel), for the People.

Thomas P. Sullivan and Norbert B. Knapke II, of Jenner & Block, and George Patrick Lynch and Kathleen M. Banar, all of Chicago, for appellee.

Tom Leahy and Dennis A. Rendleman, of Springfield, for *amicus curiae* Illinois State Bar Association.

Rene A. Torrado, Jr., and Janet M. Hedrick, of Vedder, Price, Kaufman & Kammholz, and Daniel E. Reidy and James C. Dunlop, of Jones, Day, Reavis & Pogue, all of Chicago, for *amicus curiae* Chicago Bar Association.

Michael D. Monico, of Monico, Pavich & Spevack, of Chicago, for *amicus curiae* National Association of Criminal Defense Lawyers.

JUSTICE McMORROW delivered the opinion of the court:

The primary issue raised in this appeal is whether Illinois will permit the application of the attorney-client privilege to communications between a defendant who raises an insanity defense and the psychiatrist who examines the accused at the request of defense counsel to aid in preparation of the defense.

Defendant, Pamela J. Knuckles, was charged in the circuit court of Du Page County with the 1984 slaying of her mother, Nancy Knuckles. She pleaded guilty, but that plea was later set aside on grounds of ineffective assistance of counsel. The State reinstated murder charges in 1990, and, in preparation for trial, the State issued two subpoenas to Dr. Kyle Rossiter, a psychiatrist who had examined Knuckles at her counsel's request approximately two weeks after the killing. Defense counsel disclosed other expert witnesses expected to testify for the defendant and indicated that the defense did not plan to call Dr. Rossiter to testify at trial. Knuckles moved to quash the subpoenas served on the psychiatrist and thereby preclude the State from discovering or using the psychiatrist's notes and testimony in its case. The motion to quash was sustained. The State appealed from the trial court's order quashing the subpoenas. The appellate court affirmed (226 Ill. App. 3d 714), and we granted the State's petition for leave to appeal (145 Ill. 2d R. 315).

## BACKGROUND

In November 1984, Pamela Knuckles and her brother, sister, and others were charged with killing Nancy Knuckles by strangulation and suffocation. Pamela Knuckles' court-appointed public defender obtained court authorization to retain a psychiatrist to interview her. The psychiatrist, Dr. Kyle Rossiter, met with Knuckles at the Du Page County jail approximately two

weeks after the murder. He took notes of her statements but did not prepare a written report, nor did he testify at any proceeding involving her. Knuckles' counsel disclosed to the State in April 1985 that the defense would not be offering evidence of physical or mental examinations or scientific tests. Following plea negotiations, Knuckles pleaded guilty and was sentenced to 33 years in prison.

New attorneys entered an appearance on Knuckles' behalf, and in January 1989, Knuckles filed a post-conviction petition challenging the validity of her guilty plea on grounds of ineffective assistance of counsel. Her petition stated that she had pleaded guilty because her appointed counsel advised her that if she went to trial she faced the death penalty. However, at the time of the killing, Knuckles was 17 years old and would have been exempted from the death penalty under Illinois law. Following an evidentiary hearing, the trial court granted Knuckles' post-conviction petition and allowed her to withdraw her plea of guilty.

Knuckles' attorneys retained several experts to evaluate Knuckles' history of physical and psychological abuse and her mental state at the time of the charged offenses. Pursuant to Supreme Court Rule 413(d), the defense lawyers notified the prosecution that their client would rely on two defenses at trial: insanity and self-defense. At the same time, the defense disclosed the names of its five expert witnesses, the experts' reports, and test results indicating the possibility that Knuckles suffered from a brain abnormality. Dr. Rossiter was not among the experts whom the defense listed as witnesses for trial.

The State then served two subpoenas on Dr. Rossiter. One sought any written memoranda he had made of his interview with Knuckles and the other sought to compel his testimony at trial. The State also invoked its

statutory right to compel Knuckles to submit to a psychiatric examination by an expert retained by the State.

On July 20, 1990, the trial court quashed the two subpoenas that had been issued to Dr. Rossiter. The court held that a psychiatrist hired by defense counsel to examine the client for purposes of trial preparation is an agent of defense counsel and therefore the communications between the defendant and the defense-retained psychiatrist are protected by the attorney-client privilege. The trial court further held that the privilege is not waived by the assertion of the insanity defense; the State is not allowed to discover or elicit the opinions and notes of the defense psychiatrist unless the psychiatrist testifies at trial. Finally, the trial court held that the opinions and notes or findings of the psychiatrist in such a case are protected by the work-product doctrine (134 Ill. 2d R. 412(j)(i)).

The State filed an interlocutory appeal from the trial court's order quashing the subpoenas. Before filing the notice of appeal, the State retained its own expert witness, who examined defendant.

The appellate court affirmed the trial court's ruling, noting that the applicability of the attorney-client privilege in this context is a matter of first impression in Illinois.

## ANALYSIS

This appeal highlights the tension between two competing policies: one that favors the broad discovery of relevant information and another that guards the narrow discovery exemptions, based on privilege, which are deeply rooted in the common law and the Federal and State Constitutions. The State argues that since Dr. Rossiter is the only psychiatrist who examined Pamela Knuckles near the time her mother was killed, his impressions of Knuckles' mental state are of surpassing importance in this case. If the potential relevance of the

information sought were the key to determining whether the attorney-client privilege should yield to the truth-seeking process, the State's argument would be persuasive. However, the policies underlying the privilege exist apart from and run counter to the primary goals of discovery. The *raison d'être* of the privilege is to secure for the client the ability to confide freely and fully in his or her attorney, without fear that confidential information will be disseminated to others. See, *e.g., People v. Adam* (1972), 51 Ill. 2d 46, 48 (client's communications made in confidence to legal advisor are permanently protected from disclosure unless the privilege is waived); accord *People v. Williams* (1983), 97 Ill. 2d 252, 294; *People v. Knippenberg* (1977), 66 Ill. 2d 276 (privilege extends to communications made to defense lawyer's investigator).

I.

Extension of the Attorney-Client Privilege to Communications Between Defense Counsel and a Psychiatric Consultant Engaged by the Defense

Initially, this court must determine whether the attorney-client privilege should be extended to communications made to or made by an expert witness, here a psychiatrist, whose engagement by the defense is necessary to the preparation of an insanity defense. No Illinois case has decided that precise issue. This court has observed that a privileged or protected communication does not have to be made directly to the attorney rather than an agent of the attorney, because the privilege " 'protects communications to the *attorney's clerks* and his other agents (including stenographers) for rendering his services. The assistance of these agents being indispensable to his work and the communications of the client being often necessarily committed to them by the attorney or by the client himself, the privilege must

include all the persons who act as the attorney's agents.' 8 Wigmore, Evidence sec. 2301, at 583 (McNaughton Rev. ed. 1961)." (Emphasis in original.) *Knippenberg*, 66 Ill. 2d at 283-84. See also *State v. Hitopoulus* (1983), 279 S.C. 549, 550, 309 S.E.2d 747, 748 (holding that psychiatrist was, "in effect, the attorney's agent for \*\*\* transmission to the attorney of confidential facts"); *People v. Hilliker* (1971), 29 Mich. App. 543, 548, 185 N.W.2d 831, 833 (attorney-client privilege extends to confidential communications "made to the attorney by an agent on behalf of the client, such as a doctor or psychiatrist").

### A. *Common Law Basis of Attorney-Client Privilege*

The attorney-client privilege derives from traditional principles of common law. (See, *e.g., People v. Adam* (1972), 51 Ill. 2d 46.) The "work-product" doctrine is embodied in Supreme Court Rule 412(j)(i), which governs the attorney's right to the secrecy of the attorney's notes and legal strategies. (134 Ill. 2d R. 412(j)(i).) This rule protects from disclosure an attorney's work product to the extent the documents or memoranda contain "the opinions, theories or conclusions \*\*\* of defense counsel or his staff." See also *Monier v. Chamberlain* (1966), 35 Ill. 2d 351.

The State argues in this appeal that the application of the privilege to defendant's communications with psychiatrists is unwarranted because a doctor is neither an extension of the defense attorney nor a mere conduit for information. We acknowledge that the secretary who types clients' documents and attorneys' notes performs a markedly different function from that of a physician who evaluates the mental condition of the client. Clerks, typists, and secretaries are typical examples of the attorney's ministerial agents for purposes of the privilege; doctors and other experts perform functions that differ in kind. While an expert is not an employee of an attorney in the same sense as are the staff members of a

law firm, a defense attorney who believes his client's mental condition is critical to an insanity defense will require assistance from a specialist in the field of psychiatry. As a matter of due process, when the mental capacity of an accused forms the defense to the crime charged, the courts have held that the defendant is entitled to psychiatric assistance, which "may well be crucial to the defendant's ability to marshal his defense." (*Ake v. Oklahoma* (1985), 470 U.S. 68, 80, 84 L. Ed. 2d 53, 64, 105 S. Ct. 1087, 1095; accord *People v. Kegley* (1988), 175 Ill. App. 3d 335.) In *People v. Nichols* (1979), 70 Ill. App. 3d 748, the appellate court held that the trial court committed reversible error by denying the defendant's request for funds to retain a psychiatrist for a possible insanity defense; the fact that two doctors had already examined defendant as to his fitness to stand trial was held not to satisfy the need for an examination specifically to explore an insanity defense.

In *Knippenberg*, this court held that an investigator's interview with the client, at the request of defense counsel, is protected by the attorney-client privilege. *Knippenberg* emphasized that lawyers have a duty to fully investigate their clients' cases; the court rejected the State's contention that an investigator is not necessary or essential to communication between the defendant and his attorney: "[R]ealities of practice often require an attorney's use of investigators." *Knippenberg*, 66 Ill. 2d at 284.

The appellate court in the case at bar found that the rationale of *Knippenberg* "applies with equal force to a psychiatrist or psychologist who, like Dr. Rossiter, is retained by defendant or defendant's attorney in order to assist counsel in the evaluation, preparation, or presentation of an insanity defense. Accordingly, under that holding, Dr. Rossiter's communications with defen-

dant are protected by the attorney-client privilege absent a waiver of the privilege." (226 Ill. App. 3d at 718.) The appellate court then distinguished the instant case from the situation in *People v. Speck* (1968), 41 Ill. 2d 177, 200. In *Speck*, this court held that the attorney-client privilege was not violated when the State called a fingerprint expert, who had consulted with the defense, to testify regarding the prints found at the crime scene. The expert did not reveal the contents of any conversation he had with defense counsel or defendant but merely gave his opinion that certain fingerprints found in the victims' residence belonged to Speck. The expert's testimony was based solely on his visual comparisons of the prints found at the crime scene to prints that were known to be defendant's. Unlike the expert's testimony in *Speck*, in the case at bar the opinion of the psychiatrist as to Knuckles' sanity "will almost invariably result in large part from confidential communications with the defendant which would be directly or indirectly revealed if the psychiatrist testified on behalf of the State." 226 Ill. App. 3d at 718.

Our research indicates that most courts presented with the issue have applied the attorney-client privilege to disclosures that defendants make to psychiatric experts retained by their attorneys to aid in the preparation of the defense. (*E.g., United States v. Alvarez* (3d Cir. 1975), 519 F.2d 1036; *Houston v. State* (Alaska 1979), 602 P.2d 784; *People v. Lines* (1975), 13 Cal. 3d 500, 531 P.2d 793, 119 Cal. Rptr. 225; *Miller v. District Court* (Colo. 1987), 737 P.2d 834, 836; *State v. Toste* (1979), 178 Conn. 626, 424 A.2d 293; *State v. Pratt* (1979), 284 Md. 516, 398 A.2d 421; *People v. Hilliker* (1971), 29 Mich. App. 543, 185 N.W.2d 831; *State v. Kociolek* (1957), 23 N.J. 400, 129 A.2d 417; *Ballew v. State* (Tex. Crim. App. 1980), 640 S.W.2d 237. See also *Pouncy v. State* (Fla. App. 1977), 353 So. 2d 640; *Ursry v. State* (Fla. App.

1983), 428 So. 2d 713; *Marano v. Holland* (1988), 179 W. Va. 156, 366 S.E.2d 117.) In contrast, a few jurisdictions hold that a client's communications to a defense-retained psychiatrist are *not* shielded by the attorney-client privilege. See. *State v. Craney* (Iowa 1984), 347 N.W.2d 668 (rejecting argument that the sixth amendment provided a constitutional attorney-client privilege and further holding that state statute did not shield client's revelations to psychiatrist); *State v. Carter* (Mo. 1982), 641 S.W.2d 54 (narrowly construing statute barring disclosure of communications made to attorney by client) (three judges dissenting).

In States that have codified the attorney-client privilege by statute, the better-reasoned decisions acknowledge the common law roots of the privilege as well as the constitutional concerns that may arise if a criminal defendant is forced to reveal information gathered as part of the defense investigation. (See, *e.g.*, *Miller v. District Court* (Colo. 1987), 737 P.2d 834, 837; *State v. Pratt* (1979), 284 Md. 516, 519, 398 A.2d 421, 423; *Ballew v. State* (Tex. Crim. App. 1982), 640 S.W.2d 237, 239-40.) In *Miller*, the Colorado Supreme Court recognized the applicability of the attorney-client privilege to communications between the client and a defense-retained psychiatrist, even though the Colorado attorney-client statute does not expressly include psychiatrists in its listing of agents that are subject to the privilege.

In contrast to the above, Missouri's highest court has limited Missouri's statutory attorney-client privilege to communications made between the client and attorney only, stating that the "attorney-client privilege is created by statute." (*State v. Carter* (Mo. 1982), 641 S.W.2d 54, 57.) The court in *Carter* held that admission of adverse testimony of a defense-retained psychiatrist was not within the statutory privilege, did not violate the work-product doctrine, and did not deprive defen-

dant of the sixth amendment right to effective assistance of counsel. Three justices in *Carter* dissented, however, in two separate opinions. As to the scope of the Missouri attorney-client provision, the dissenters observed that the statute simply embodied the common law attorney-client privilege. The dissenters observed that Missouri precedent had already applied the attorney-client privilege to defense communications with an insurance adjuster; therefore, the statute did not bar the extension of the privilege to defense-retained psychiatrists. (*Carter*, 641 S.W.2d at 64 (Seiler, J., dissenting, joined by Welliver & Bardgett, JJ.).) One of the dissenters noted that the majority's ruling would cause attorneys to render ineffective assistance of counsel. *Carter*, 641 S.W.2d at 66-67 (Welliver, J., dissenting).

We believe that Illinois should accord the common law attorney-client privilege the scope necessary to meet the complexities of modern legal practice. This court's opinion in *Knippenberg* reflects that view. Testimonial privileges are, by their nature, inconsistent with the search for truth. (*E.g., People v. Sanders* (1983), 99 Ill. 2d 262, 270.) Privileges will prevent otherwise relevant and admissible evidence from being disclosed. Accordingly, if we were to accept the argument that the relevance of the evidence justified its admission, notwithstanding the attorney-client privilege, no claim of privilege could ever prevail. The exception would devour the rule.

### B. Constitutional Concerns

We further recognize that a restricted application of the attorney-client privilege may erode Federal or State constitutional rights. Several cases from other jurisdictions have observed that the sixth amendment right to effective assistance of counsel may be jeopardized by the forced disclosure of communications between the defendant and a psychiatrist engaged by the defense attorney.

*E.g., United States v. Alvarez* (3d Cir. 1975), 519 F.2d 1036, 1046-47 (defense counsel should not be forced to run the risk of inadvertently creating government witnesses through counsel's investigation of possible insanity defense); *State v. Pratt* (1979), 284 Md. 516, 520, 398 A.2d 421, 423 ("While never given an explicit constitutional underpinning, the privilege is *** closely tied to the federal, as well as [Maryland's], constitutional guarantees of effective assistance of counsel and could, if limited too severely, make these basic guarantees virtually meaningless"); *cf. Noggle v. Marshall* (6th Cir. 1983), 706 F.2d 1408, 1413-15 (holding that while both Federal and most State courts agree that psychiatric experts retained by the defense are shielded by the attorney-client privilege, the "difficult question under the Sixth Amendment" did not require the Ohio State court to give the privilege constitutional stature under the rubric of effective assistance of counsel); *Marano v. Holland* (1988), 179 W. Va. 156, 170, 366 S.E.2d 117, 131 (upholding application of attorney-client privilege but declining to reach sixth amendment issue "as it seems somewhat obscure").

This court previously has observed that a violation of the attorney-client privilege may indeed result in the denial of effective assistance of counsel as well as a fair trial. (*Knippenberg*, 66 Ill. 2d 276.) After finding that "grave and inexcusable" prejudice resulted from the State's use of information obtained from a defense-retained investigator who interviewed the defendant, this court stated: " '[T]he essence of the Sixth Amendment right is *** privacy of communication with counsel.' " (*Knippenberg*, 66 Ill. 2d at 285, quoting *United States v. Rossner* (2d Cir. 1973), 485 F.2d 1213, 1224.) We see no reason to depart from that view. We find that reference to the sixth amendment in such opinions as *Alvarez, Pratt* and *Miller* helps to preserve the vitality of

the attorney-client privilege by underscoring the unique place the privilege holds in our jurisprudence. (See *State v. Kociolek* (1957), 23 N.J. 400, 413, 129 A.2d 417, 424-25 (applying the privilege to communications between an attorney "and a scientific expert retained to aid in the presentation of the defense, a confidential employment").) In *Kociolek* the court reviewed the history and purpose of the attorney-client privilege at length, noting that the "ancient common-law privilege, in this country and in England *** [was] deemed a basic civil right, indispensable to the fulfillment of the constitutional security against self-incrimination and the right to make defense with the aid of counsel skilled in the law." The court further observed that the privilege is an accommodation of competing public interests and that, although not given express constitutional security, is "essentially interrelated" with the right to counsel and immunity from self-incrimination. *Kociolek*, 23 N.J. at 413-14, 129 A.2d at 425.

The privilege against self-incrimination and the policy considerations at issue here are analogous to those which underlie a defendant's right to remain silent. In the course of a criminal investigation, a defendant may be the best or even the only witness to a crime. Without his testimony successful prosecution may be impossible. In such a situation, the defendant's privilege against self-incrimination could scarcely be more at odds with the general principle that the public has "a right to every man's evidence." (8 J. Wigmore, Evidence § 2192, at 70 (McNaughton rev. ed. 1961).) As the United States Supreme Court has stated, "The privilege against self-incrimination enjoined by the Fifth Amendment is not designed to enhance the reliability of the factfinding determination; it stands in the Constitution for entirely independent reasons." (*Allen v. Illinois* (1986), 478 U.S. 364, 375, 92 L. Ed. 2d 296, 308, 106 S. Ct. 2988, 2995.)

Accordingly, it is "no argument against a claim of the privilege to say that granting the claim would decrease the reliability of the factfinding process." *Allen*, 478 U.S. at 375, 92 L. Ed. 2d at 308, 106 S. Ct. at 2995.

## II.

### Waiver of Attorney-Client Privilege by Assertion of Insanity Defense

A minority of jurisdictions have held that the attorney-client privilege is automatically waived whenever the accused puts his or her mental state in issue in the form of an insanity defense. *People v. Edney* (1976), 39 N.Y.2d 620, 350 N.E.2d 400, 385 N.Y.S.2d 23; *State v. Bonds* (1982), 98 Wash. 2d 1, 653 P.2d 1024 (majority opinion finding waiver of attorney-client privilege whenever defense raises insanity defense, but four justices dissenting on scope of majority's ruling on that issue; dissenters agreed that waiver had occurred under the facts but noted that waiver should not apply when defense-retained expert is not called as witness in any prior proceeding); see *Austin v. Alfred* (1990), 163 Ariz. 397, 788 P.2d 130 (rejecting application of work-product doctrine and attorney-client privilege to disclosure of names and reports of defense mental health experts, but holding that trial court should bar from disclosure defendant's statements concerning the offenses); see also *Noggle v. Marshall* (6th Cir. 1983), 706 F.2d 1408, 1412 (upholding Ohio's limited privilege that only precludes the State's use of a defense psychiatrist during its case in chief, but not in rebuttal).

In the case at bar, the State argues that we should follow the reasoning of those cases that employ the automatic waiver rule when a defendant puts his mental state in issue. However, we do not find those cases persuasive. In *Edney*, the New York Court of Appeals held that the attorney-client privilege was waived

because State law allowed prosecutors to compel a defendant to submit to an examination by a State-retained psychiatric expert, and therefore the very facts that would be secreted by the privilege necessarily would be disclosed through the compelled examination. (*Edney*, 39 N.Y.2d at 625, 350 N.E.2d at 403, 385 N.Y.S.2d at 26.) We note that the rationale of *Edney* has been questioned. See *Miller*, 737 P.2d at 838 n.4 ("[*Edney*] represents the clear minority view and has been sharply criticized by the American Bar Association as 'confused' and 'unpersuasive' "); see also *United States v. Layton* (N.D. Cal. 1981), 90 F.R.D. 520, 525 (noting that in the *habeas corpus* proceedings that followed the direct appeal in *Edney*, a Federal judge for the Eastern District of New York strongly disagreed with the State court's view that the attorney-client privilege was waived when a defendant put his mental state in issue but was "unable to conclude that the view was unconstitutional"), citing *United States ex rel. Edney v. Smith*, 425 F. Supp. 1038, 1053, *aff'd* (2d Cir. 1976), 556 F.2d 556. *Cf. People v. Newbury* (1982), 53 Ill. 2d 228, 234 (finding waiver of statutory physician-patient privilege once defendant called his psychiatrist to testify on his behalf).

After carefully considering the cases from other jurisdictions, we find that the better-reasoned decisions hold that the privilege is waived only with respect to the testimony and reports of those experts who are identified by the defense as witnesses who will be called to testify on behalf of the defendant at trial, or whose notes and reports are used by other defense experts who testify. Additional support for this rationale may be found in the American Bar Association's Criminal Justice Mental Health Standards (ABA Standards), which disfavor waiver of the attorney-client privilege except in limited circumstances. (See *Miller*, 737 P.2d at

839 n.5 (text of ABA Standard 7—3.3(b) and commentary).) Policy reasons for recognizing the privilege in the mental health context and for limiting the waiver doctrine include the "chilling effect" disclosure of experts would have upon a client's willingness to confide in his or her attorney and consultants; inherent prejudice that occurs if the trier of fact learns that a mental health professional testifying at trial was originally retained by the defense; concern that allowing waiver would, in effect, cause the defense to assist the State in discharging its burden of proof; and recognition that the defense would be inhibited from consulting with mental health professionals for fear of creating prosecution witnesses, and might not consult them even though professional assistance might be crucial to the case. Criminal Justice Mental Health Standards § 7—3.3(b), Commentary, at 7—86 (2d ed. 1986). See also *State v. Pratt*, 284 Md. at 521-25, 398 A.2d at 424-26.

We hold that the attorney-client privilege in Illinois protects communications between a defendant who raises an insanity defense and a psychiatrist employed by defense counsel to aid in the preparation of the defense, if the psychiatrist will not testify and the psychiatrist's notes and opinions will not be used in the formulation of the other defense experts' trial testimony. Accordingly, we hold that the attorney-client privilege has not been waived in the case at bar with respect to the testimony and notes of Dr. Rossiter.

### III.

### Public Interest Exception

The State next argues that if we uphold the privilege and find that it was not waived by defendant's assertion of the insanity defense, we should "make an exception for the unique circumstances of this case." The State urges us to find that the privilege must yield

to the public interest in the truth-finding process, because here the State's ability to rebut the insanity defense may be seriously hampered by its inability to discover the notes and opinions of the one doctor who examined defendant near the time of the alleged homicide. In support of a "public interest" exception to the attorney-client privilege, the State cites a Florida decision, where the court commented that the privilege may be set aside in those cases "where the trier of fact is so effectively deprived of valuable witnesses so as to undermine the public interest in the administration of justice." *Pouncy v. State* (Fla. 1977), 353 So. 2d 640, 642, citing *People v. Edney* (1976), 39 N.Y.2d 620, 350 N.E.2d 400, 385 N.Y.S.2d 23.

In *Pouncy*, the prosecution had argued that adoption of the attorney-client privilege "would encourage the defense to 'scoop' up all the qualified experts in a given field, *i.e.*, psychiatry, thus precluding the State from effectively presenting its case." (*Pouncy*, 353 So. 2d at 642.) However, absent evidence that the defense had in fact attempted to consult with all available experts and thereby block the State's ability to find its own witnesses, the *Pouncy* court found this argument unpersuasive. The prosecutors in *Pouncy* also argued, as does the State in the pending case, that defendant's psychiatrists had examined him shortly after the crime and were therefore more qualified to offer an opinion as to his mental state than were the psychiatrists who had examined him some months later. The *Pouncy* court rejected the argument, holding that there was no overriding public interest in the case before it and finding that the trial court had erred in failing to quash the State's subpoenas that sought the results of the examinations of the defense-retained psychiatrists.

Although the *Pouncy* court espoused a public interest exception to the attorney-client privilege, the court

did not apply such an exception to the facts before it. We find the circumstances in our case analogous to those in *Pouncy* and similarly decline to apply a public interest exception in the case at bar. There is nothing in the record to indicate, under the *Pouncy* court's stated test, that the trier of fact will be "deprived of valuable witnesses so as to undermine the public interest in the administration of justice." (*Pouncy v. State* (Fla. 1977), 353 So. 2d 640, 642, citing *People v. Edney* (1976), 39 N.Y.2d 620, 350 N.E.2d 400, 385 N.Y.S.2d 23.) Both sides have retained experts who presumably are prepared to render their opinions as to Knuckles' mental condition at the time of the homicide with which she is charged. Neither side will present the results of Dr. Rossiter's evaluation of Knuckles' sanity shortly after the crime was committed. Although the defense may derive a benefit from the exclusion of Dr. Rossiter's testimony, we have no way of knowing what evidence may have been presented if Knuckles had received competent assistance of counsel and received a trial, instead of entering a plea of guilty on the erroneous advice of counsel. The interests served by the preservation of the attorney-client privilege should not turn on the passage of time alone. Such a rule would be illogical and arbitrary. Although the State argues that its ability to prosecute Knuckles will be severely hampered because the prosecutors will be denied discovery and use of Dr. Rossiter's examination of her, it cites no case in which the mere passage of time and resulting loss of opportunity to discover information have been deemed to nullify the fundamental purpose of the attorney-client privilege. Indeed, to adopt the State's argument would be to eviscerate the privilege with the sword of expediency, disregarding historical policy and reasoned analysis.

Illinois law requires that a defendant must inform the State of the defenses that the defendant intends to

present, after the State files a motion requesting that information. (134 Ill. 2d R. 413(d).) In addition, the State is entitled to seek a court order compelling a defendant who raises an insanity defense to submit to an examination by at least one qualified psychiatrist or clinical psychologist named by the State. (Ill. Rev. Stat. 1989, ch. 38, par. 115–6.) By operation of these provisions the State ordinarily may obtain early access to expert evaluations of the defendant's sanity and thereby safeguard the truth-seeking purpose of the trial.

The case at bar is unusual in that the trial has yet to take place despite the passage of approximately ten years since the alleged homicide. Dr. Rossiter examined Knuckles in December 1984, shortly after the commission of the charged offenses. Thereafter, defense counsel disclaimed any intention of raising an insanity defense and relied on the State's inability to prove its case beyond a reasonable doubt. From the State's point of view, Knuckles' decision to enter a guilty plea, in June 1985, rendered moot the question of her mental condition at the time of the offenses. Accordingly, there was no apparent need for the prosecution to garner or preserve evidence of the defendant's mental state, and no other examination of the defendant was conducted in that period. The defendant was not examined by a prosecution expert until July 1990, more than $5^{1}/2$ years after the occurrence. However, the delay in the trial of the case cannot be attributed to Knuckles. After she had served five years in prison, the trial court, in post-conviction proceedings, vacated her conviction and sentence. The circuit court held that Knuckles' plea of guilty had been obtained through the ineffective assistance of counsel, who wrongly advised her that she was eligible for the death penalty. There is nothing in the record to indicate that defendant or her counsel has engaged in any bad-faith conduct or otherwise deliberately prevented the prosecution from obtaining discoverable evidence.

The State cites *Cesena v. Du Page County* (1991), 145 Ill. 2d 32, in support of the principle that this court "has shown itself to be willing to fashion unusual remedies for unusual cases." However, *Cesena* did not expressly address the attorney-client privilege and has no application to the facts of the case at bar.

We note that courts in other jurisdictions have refused to erode the attorney-client privilege by applying a generalized formulation of the public interest in the truth-seeking process. (See *In re John Doe Grand Jury Investigation* (1990), 408 Mass. 480, 562 N.E.2d 69 (expressly refusing to create a public interest exception to the attorney-client privilege); *cf. In re Kozlov* (1979), 79 N.J. 232, 398 A.2d 882 (remarking that attorney-client privilege might be overcome in some situations by a showing of need, but not applying any exception to the attorney-client privilege in the case before it).) The Massachusetts Supreme Judicial Court stated that "extraordinary high value must be placed on the right of every citizen to obtain the thoughtful advice of a fully informed attorney concerning legal matters. *** [The potential impairment of the privilege by recognizing the public interest exception] is inconsistent with the traditional value our society has assigned, in the interest of justice, to the right to counsel and to an effective attorney-client relationship." *In re John Doe Grand Jury Investigation*, 408 Mass. at 485, 562 N.E.2d at 71-72.

The public interest in the administration of justice involves more than maximizing access to information. The "centrality of open client and attorney communication to the proper functioning of our adversary system of justice" requires the recognition that the attorney-client privilege must prevail despite its effect of withholding relevant information from the fact finder. (*United States v. Zolin* (1989), 491 U.S. 554, 562, 105 L. Ed. 2d 469, 484-85, 109 S. Ct. 2619, 2626.) We conclude

that there is no sound basis in the instant case to abridge the operation of the attorney-client privilege.

For the reasons set out in this opinion, we hold that the attorney-client privilege applies to communications between the defense and nontestifying mental health experts retained by the defense to probe the defendant's mental condition in anticipation of relevant defenses. We further hold that the privilege is not waived merely by the assertion of defenses which place the defendant's mental condition in issue. Finally, we decline to adopt a generalized public interest exception in the case at bar to allow the State's interest in gathering evidence to overcome the attorney-client privilege. Therefore, we affirm the judgment of the appellate court.

*Appellate court affirmed.*

JUSTICE MILLER, concurring in part and dissenting in part:

I agree with the court that the attorney-client privilege generally extends to communications made by a defendant to a mental health professional and, moreover, that the privilege is not waived or lost simply by the defendant's assertion of an insanity defense. Under the unique circumstances of this case, however, I would grant the prosecution access to evidence developed by the psychiatrist who examined the defendant shortly after the commission of the present crimes.

The defendant was charged with the murder of her mother, Nancy Knuckles. According to the indictment, the defendant strangled her mother with a rope as the victim was leaving for work on the morning of November 28, 1984. A codefendant, Dennis Morris, assisted the defendant. After Mrs. Knuckles fell to the floor, the defendant's brother, Barton Knuckles, secured a plastic bag over the victim's head to prevent her from breathing. The body was then hidden in a steamer trunk, and the trunk was later dumped in a creek. For her role in

these offenses, the defendant was indicted on two counts of murder, two counts of conspiracy, and one count of concealment of a homicidal death. Five codefendants, with varying levels of participation in the crimes, were charged as well.

Dr. Lyle Rossiter, a psychiatrist retained by the defense, examined the defendant on December 12, 1984, just two weeks after the occurrence charged here. In April 1985, pursuant to Supreme Court Rule 413, the defense disclosed to the prosecution that it would not present at trial evidence of any physical or mental examinations or scientific tests. (107 Ill. 2d R. 413.) Moreover, counsel stated at that time that the sole defense to the charges would be a challenge to the sufficiency of the evidence. The parties later reached a plea agreement, and in June 1985 the defendant pleaded guilty to one count of murder and was sentenced to 33 years' imprisonment. As part of the agreement, the State nol-prossed the remaining charges against the defendant.

In January 1989, the defendant sought post-conviction relief, raising a number of grounds in support of her petition. In August 1989, more than four years after the defendant's guilty plea, the trial court granted the defendant's post-conviction petition. The defendant was then charged again with the original offenses. Represented by new counsel, the defendant later disclosed her intention to pursue two possible defenses at trial, insanity and self-defense. The defendant's list of potential witnesses did not include the name of Dr. Rossiter, however. The State subsequently served Dr. Rossiter with a subpoena *duces tecum*, seeking any notes, reports, or memoranda prepared as part of his December 1984 examination of the defendant, as well as with a trial subpoena for his testimony.

I agree with the court that communications by a de-

fendant to a defense-retained mental-health expert are protected by the attorney-client privilege and, further, that a defendant's decision to raise an insanity defense does not automatically result in the waiver of the privilege. Even in a jurisdiction subscribing to this view, however, it has been suggested that the shield of the attorney-client privilege must sometimes give way to the substantial public interest in the disclosure of otherwise protected information. (*Pouncy v. State* (Fla. App. 1977), 353 So. 2d 640, 642.) The majority's refusal in the present case to enforce the subpoenas issued by the State to Dr. Rossiter will deprive the prosecution of reliable and perhaps irreproducible evidence of the defendant's mental condition near the time of the charged offenses. Thus, I believe that the privilege must yield in the case at bar to the substantial public interest in allowing the prosecution access to this unique evidence.

Dr. Rossiter's testimony is particularly vital to the State because of the substantial delay between the defendant's original mental examination and the present proceedings. As noted by one court, which denied *habeas corpus* relief to a defendant whose assertion of an insanity defense had been held to result in the waiver of any privilege:

> "[T]here may well be instances where the psychiatrist seeing the defendant at defense counsel's request shortly after the event, may have much more useful information than would a doctor who saw him much later when treatment and soothing time have intervened to change the defendant's reactions." *United States ex rel. Edney v. Smith* (E.D.N.Y. 1976), 425 F. Supp. 1038, 1052-53, *aff'd without opinion* (2d Cir. 1977), 556 F.2d 556.

Dr. Rossiter examined the defendant in December 1984, shortly after the occurrence charged here. Defense counsel later disclaimed any intention of raising an insanity defense, however, and the defendant's eventual

decision, in June 1985, to enter a guilty plea seemingly made moot any issue regarding her mental condition. Relying on the defendant's actions, the State had no apparent need then to garner or preserve any psychological evidence, and no other examination of the defendant was conducted in that period. The defendant was not examined by a prosecution expert until July 1990, more than $5^1/2$ years after the crimes, when the defendant finally put her mental state at issue.

Because of this lengthy delay, which is due in no part to the conduct of the prosecution, I would allow the State access to Dr. Rossiter's evidence. Had the defendant chosen to raise an insanity defense in 1985, the State could have promptly obtained an order requiring the defendant to submit to an examination by the mental-health expert of its choice. (See Ill. Rev. Stat. 1985, ch. 38, par. 115—6.) The unusual course of events in this case, however, denied the prosecution an opportunity to have the defendant examined by its own expert in the immediate aftermath of the crimes. Dr. Rossiter is the only expert witness who can provide nearly contemporaneous evidence of the defendant's mental condition at the time of the offenses. In these circumstances, the prosecution, and perhaps ultimately the trier of fact, should not be denied his evidence if the defendant elects to raise an insanity defense. Contrary to the majority's assertion (165 Ill. 2d at 135), the State's argument is not that relevance must, in all cases, overcome the attorney-client privilege, but simply that relevance may do so here. This is not a generalized public-interest exception, as the majority elsewhere insists (165 Ill. 2d at 144), but a particularized one, tailored to and reflective of the procedural history of this case.

I do not believe that the disclosure requested by the State would trench on the defendant's constitutional rights to the assistance of counsel or to a fair trial,

alternative theories advanced by the defense. Accordingly, I would enforce the subpoenas issued to Dr. Rossiter and allow the prosecution access to the material sought, if on remand the defendant continues to assert an insanity defense.

JUSTICE HEIPLE, dissenting:

I have but a single objection to the majority opinion and it is a simple one. The case has been wrongly decided.

On the unique facts of this case, justice demands that the so-called attorney-client privilege must fall. The truth-seeking function of a trial deserves to be given precedence.

The defendant has raised an insanity defense pertaining to a killing which occurred in 1984. This opinion bars the disclosure of a psychiatric examination of defendant which took place in the month following the killing. Subsequent to that examination, defendant pleaded guilty to murder and was sentenced. Now, 10 years later, her conviction has been set aside and a new trial is to be held. Defendant does not deny killing her mother. Rather, she claims that she was insane at the time of the killing.

One question arises. Which is the more credible evidence of the defendant's mental state on November 28, 1984: the psychiatric examination conducted in the month following the killing or a psychiatric examination conducted 10 years later?

With the defendant's plea of guilty to murder, the State had no reason to seek its own psychiatric examination of defendant to determine her mental state at the time of the killing. Now, 10 years later when faced with a trial, it is highly questionable, indeed, highly doubtful, whether a credible psychiatric inquiry can be made as to that event.

Had the case proceeded to trial at any reasonable

period of time following the killing, had the prosecution any reason to obtain a psychiatric examination at that time and neglected to do so, and if the evidence which the State now seeks regarding the defendant's sanity could credibly and reasonably be obtained in any other way, it would be reasonable and just to uphold the defendant's claim of privilege. Those circumstances, however, do not prevail.

Justice belongs not alone to a defendant but to the public as well. The truth-seeking function of a trial should not be written off or incautiously disregarded. That is precisely what the majority opinion does. Accordingly, I respectfully dissent.

CHIEF JUSTICE BILANDIC joins in this dissent.