2024 IL App (3d) 230357

Opinion filed October 18, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Appeal No. 3-23-0357 Circuit No. 19-CF-555 |
| ROBERT A. WATSON, | ) ) | Honorable David M. Carlson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ALBRECHT delivered the judgment of the court, with opinion.
Justices Brennan and Peterson concurred in the judgment and opinion.

_____

**OPINION**

¶ 1        After a jury trial, defendant, Robert A. Watson, was found guilty but mentally ill of first

degree murder. He appeals his conviction, arguing that the court erred by (1) denying his request

for a continuance so he could obtain a third sanity evaluation, (2) allowing the State access to the

sanity report of an expert defendant originally retained and permitting the State to call that expert

as a rebuttal witness, and (3) rereading the implicit bias jury instruction to the jury which

defendant argues coerced the jury to return a guilty verdict. For the reasons that follow, we

reverse and remand for a new trial.

¶ 2                                    I. BACKGROUND

¶ 3        The State charged defendant with four counts of first degree murder in April 2019. The indictments alleged that on March 24, 2019, defendant stabbed and killed Emanuel Burgarino, who was at least 60 years old at the time, while attempting to commit armed robbery. The court appointed the public defender to represent defendant for these proceedings.

¶ 4        Following several instances where defendant refused to be transported from the jail to court, the court found a *bona fide* doubt as to defendant's fitness and ordered him to submit to a fitness evaluation. Dr. Anna Stapleton evaluated defendant on July 17, 2019, as the State's expert. Dr. Monica Argumedo, who was retained by the public defender's office, evaluated him on January 22, 2020.

¶ 5        A fitness hearing in front of a jury occurred on August 11, 2020. At the hearing, Stapleton, a psychologist employed by the county, testified on behalf of the State. She testified that during her evaluation, defendant said he experienced hallucinations; however, the hallucinations described were not consistent with what a person with schizophrenia would experience. Stapleton also found defendant's intense eye contact and the fact that he would rarely look away from her odd. Defendant communicated with her, but sometimes chose not to respond or provided a delayed response to her questions. When Stapleton asked defendant about the events of the offense, he refused to answer. Stapleton opined that defendant had antisocial personality disorder and substance abuse disorders. She did not believe he had a psychotic disorder and further believed that the behavior he exhibited was drug induced. Stapleton opined that she found defendant fit for trial.

¶ 6        Argumedo testified on defendant's behalf. While Stapleton believed defendant was malingering, Argumedo believed defendant's symptoms were genuine. She opined that

2

defendant suffered from untreated schizophrenia and that defendant was unable to assist in his own defense because he did not approach things from a basis of reality. Argumedo believed defendant's symptoms indicated he had schizophrenia because he would at times go on tangents, he heard voices, and his thought process was disorganized. Defendant was also operating under the belief that the jail was contaminating his food, which Argumedo described as delusional and paranoid. Upon reviewing defendant's medical history, Argumedo testified that she believed he developed symptoms of schizophrenia in his late teens, the typical time when a person can develop symptoms. Additionally, defendant had a family history of schizophrenia. Argumedo's opinion was that defendant was not fit for trial.

¶ 7        At the conclusion of the fitness hearing, the jury found defendant fit to stand trial.

¶ 8        On February 14, 2022, defense counsel requested another fitness evaluation when defendant again refused transport from the jail to the courthouse and began complaining that his food at the jail was contaminated. The court again found a *bona fide* doubt as to fitness and granted counsel's request, and Stapleton and Argumedo both examined defendant a second time. Stapleton again concluded that defendant was fit for trial. Argumedo testified that defendant was unfit for trial, explaining that his untreated schizophrenia prevented him from assisting in his own defense. The court held a fitness hearing on September 9, 2022, and found defendant fit.

¶ 9        On June 17, 2022, at defendant's request, the court appointed the Mental Health Unit of Will County Court Services to evaluate defendant for the purpose of conducting a sanity evaluation. Stapleton conducted the evaluation for the county. The public defender's office also privately retained Argumedo to provide a second opinion.

¶ 10        On January 20, 2023, defense counsel filed a motion to continue the trial, which was scheduled to begin on February 6, 2023. Counsel asserted that Stapleton and Argumedo had

3

conducted sanity evaluations, but neither had been able to reach an opinion regarding defendant's sanity at the time of the offense. Counsel requested a continuance so a third expert could examine defendant. The court denied the motion, stating that defendant had been evaluated by two independent evaluators and a third was not necessary.

¶ 11   Defendant provided the State notice on January 27, 2023, of his intent to raise an insanity defense at trial. On February 1, 2023, defense counsel notified the court that Stapleton had finished her sanity report, and the State later filed a motion to compel disclosure of the report. Defense counsel objected to the disclosure, arguing that the report was protected under attorney-client privilege. Additionally, counsel stated that it did not intend to use Stapleton's report or call her to testify; therefore, defendant had no duty to disclose the report.

¶ 12   Several discussions occurred regarding whether Stapleton's report constituted attorney-client privilege and whether it could be disclosed to the State. These discussions culminated in Stapleton appearing in court to explain to the attorneys how she created her report. After a conversation with Stapleton out of court, the attorneys relayed that when defendant did not cooperate with Stapleton's sanity evaluation interviews, Stapleton reached out to the State for further information. Stapleton told the attorneys that her sanity report was based on the information received by the State and her previous fitness evaluations. Defense counsel admitted to the court that she did not tender anything to Stapleton for the sanity evaluation outside of what had already been used for the fitness evaluations. However, counsel voiced her concern that the medical releases signed by defendant for the information used for the fitness evaluations would now be used against him if the State were permitted to see Stapelton's report or to use her as a rebuttal witness. The State maintained that because defendant raised insanity as a defense it was permitted to have its own insanity evaluation performed by an expert of its choosing. If the court

4

denied its motion to compel disclosure, the State asserted that it would exercise that right to have its chosen expert conduct another evaluation and would choose Stapleton to be its expert. Thus, the State would receive a report and opinion from Stapleton anyway.

¶ 13    The circuit court ruled that the State should receive the report because under section 104-14 of the Code of Criminal Procedure of 1963, when a defendant asserts an insanity defense, any of the statements made by defendant during, and the information gathered for, a prior fitness evaluation becomes admissible for the issue of whether he was insane. 725 ILCS 5/104-14(a) (West 2022). The court reasoned that because Stapleton's report was based on her prior fitness evaluations and no additional information had been given to her when formulating her opinion, there was nothing in the sanity report that the State could not view. While the court granted the State's motion, it commented, "I don't like this *** I think it puts everybody in kind of a bad spot."

¶ 14    Defendant's jury trial began on May 2, 2023. The testimony at trial established that defendant was at Harrah's Hotel and Casino in Joliet, Illinois, on March 24, 2019. At approximately 9:45 p.m., defendant entered the hotel elevator with Glenn Hill. Hill noticed defendant behaving unusually, which made him nervous. Defendant followed Hill out of the elevator at the fifth floor, so he reentered the elevator, rode down to the first floor, then went back to the fifth floor before going to his room. A few minutes after entering his room, Hill heard noises in the hall. When he looked into the hall, he saw defendant standing over Burgarino and making a striking motion. When Hill called out to defendant, defendant ran down the stairwell. Surveillance cameras captured defendant leave the hotel and cross the street. Paramedics treated Burgarino for multiple stab wounds. Burgarino died from his wounds. He was 76 years old.

¶ 15        Argumedo testified on defendant's behalf. She explained both defendant's mental health history and her sanity evaluation of him. She explained that her finding as to whether defendant was insane at the time he committed the offense was inconclusive. Stapleton testified for the State in rebuttal. She also discussed defendant's history and acknowledged that her sanity evaluation did not include any input from defendant because he was not cooperative when meeting with her. She nevertheless was able to opine that defendant was not insane at the time he committed the offense based on "all of the evidence, on all of the observations that I made of him."

¶ 16        A review of Stapleton's sanity report, contained in the record but not introduced at trial, shows that a sanity interview occurred on October 22, 2022, and when Stapleton questioned defendant regarding the events leading up to his arrest, he responded that he could not discuss his case with her. Stapleton noted that during the interview defendant was coherent, articulate, and had no speech pattern issues. He stated that he knew Stapleton thought he was lying and that he also knew it was her job to help him. During the interview, defendant repeatedly asked Stapleton if she saw the man that he could see in his peripheral.

¶ 17        The jury began deliberations on May 11, 2023, at 12:15 p.m. At approximately 4 p.m., the jury sent the court a note stating that the vote was currently 11 to 1 and that discussions were becoming unproductive. The court told the jury to continue deliberations. At 7:45 p.m., the jury wrote the court again, stating that the vote remained 11 to 1 and that there was now tension in the room because of the holdout juror. The juror, the note stated, was being biased, arguing for a different verdict based on her own experiences with mental health. The court sent the jury home for the night. The next morning the court reread the implicit bias instruction to the jury. Neither the State nor defense counsel objected to the instruction being reread. Approximately 90 minutes

after the court read the instruction to the jury, it returned with a finding of guilty but mentally ill of first degree murder.

¶ 18    Defendant's motion for judgment notwithstanding the verdict or a new trial was denied, and the court sentenced defendant to 100 years' imprisonment. Defendant's motion to reconsider his sentence was also denied.

¶ 19    Defendant timely appealed.

¶ 20                                II. ANALYSIS

¶ 21    Defendant raises several issues on appeal. He contends that the court erred in denying his motion for a continuance because it denied him the ability to receive another expert opinion regarding his sanity, in allowing the State to use Stapleton's report and call her as an expert witness, and in rereading the implicit bias jury instruction to the jury after it notified the court there were difficulties in reaching the verdict.

¶ 22    We first address defendant's argument that the court should not have ordered him to disclose Stapleton's report to the State because it violated his right to attorney-client and work-product privileges. Defendant relies on *People v. Knuckles*, 165 Ill. 2d 125 (1995), to support his argument that the report constituted attorney-client privilege and that the State should not have been allowed to view it or to use Stapleton as a witness to testify regarding her insanity report.

¶ 23    Guidance regarding medical and scientific reports is provided under Illinois Supreme Court Rule 413(c) (eff. July 1, 1982). Rule 413(c) provides:

> "Subject to constitutional limitations, the trial court shall, on written motion, require that the State be informed of, and permitted to inspect and copy or photograph, any reports or results, or testimony relative thereto, of physical or mental examinations or of scientific tests, experiments or comparisons, or any

7

other reports or statements of experts which defense counsel has in his possession or control, including a statement of the qualifications of such experts, except that those portions of reports containing statements made by the defendant may be withheld if defense counsel does not inten[d] to use any of the material contained in the report at a hearing or trial." *Id.*

Of note, this rule specifically states that it is subject to constitutional limitations. *People v. Garza*, 92 Ill. App. 3d 723, 734 (1981). This limitation includes attorney-client privilege. See *Knuckles*, 165 Ill. 2d at 135-37.

¶ 24    The purpose of attorney-client privilege is to protect a defendant's communications with his attorney to allow the defendant to communicate freely with his or her attorney without fear that such discussions will be discovered by others. *People v. Simms*, 192 Ill. 2d 348, 381 (2000). It has already been established by our supreme court that attorney-client privilege extends to communications made to an expert witness, specifically one who is engaged by the defense in preparation of an insanity defense. See *Knuckles*, 165 Ill. 2d at 140; see also *People v. Knippenberg*, 66 Ill. 2d 276, 283-84 (1977) (finding that the privilege extends to communications between a client and an attorney's agent who is necessary to the attorney's work). *Knuckles* further holds that when raising an insanity defense, communications between a defendant and psychiatric expert are protected by the attorney-client privilege so long as the expert does not testify, and the notes and opinions of that expert will not be used by other defense experts. *Knuckles*, 165 Ill. 2d at 139-40. That privilege is waived only "with respect to the testimony and reports of those experts who are identified by the defense as witnesses who will be called to testify on behalf of the defendant at trial, or whose notes and reports are used by other defense experts who testify." *Id.* at 139.

¶ 25    Here, the State argues that *Knuckles* is inapplicable because Stapleton based her opinion on prior fitness interviews and reports when defendant did not cooperate in her attempted sanity evaluation. The State contends that because defendant did not participate in Stapleton's sanity interview, no privilege was created, and *Knuckles* does not apply. For purposes of the necessary attorney-client privilege analysis, however, the State's characterization of Stapleton's interaction with defendant during the sanity evaluation is incomplete.

¶ 26    While Stapleton stated that she did not find defendant's responses useful in drafting her report, defendant did in fact communicate with her during the October 22, 2022, sanity interview. In her report, Stapleton noted defendant's behavior at the interview and that he appeared "logical and coherent." She further noted that the interview ended because defendant refused to discuss the case with her, not because he refused to speak at all. A review of the report indicates that Stapleton believed defendant's speech was articulate and understandable, indicating that a conversation did indeed occur. Additionally, defendant told Stapleton during the interview that he could not discuss the case with her and that he knew that she believed he was lying. Sufficient communications occurred such that Stapleton could reach an opinion that defendant was coherent but uncooperative at the time of the interview.

¶ 27    The Second District, in discussing *Knuckles* when it was before the court, found that privilege must apply for a medical expert who was originally retained by the defendant for a sanity evaluation, because the opinion of defendant's sanity "will almost invariably result in large part from confidential communications with the defendant which would be directly or indirectly revealed if the psychiatrist testified on behalf of the State." *People v. Knuckles*, 226 Ill. App. 3d 714, 718 (1992). To the extent the State argues that Stapleton's report and opinion were not based "in large part" on confidential communications because they were based on

9

defendant's fitness evaluations, the fact remains that Stapleton's report still offered opinions that were based on communications and observations from her meeting with defendant on October 22, 2022, in reaching her sanity decision that cannot now be separated from other bases for the same opinion. Additionally, Stapleton testified at trial that she based her opinion on all evidence and observations that she made of the defendant, indicating that the October 22, 2022, conversation and observations referenced in her sanity report did indeed factor into her opinion of whether defendant was insane at the time of the offense. The conversation, and the opinion derived from it, are protected by attorney-client privilege unless defendant chooses to waive it.

¶ 28    The caselaw is also clear that the State may not elicit the opinions and notes of a defense expert unless that expert testifies at trial or the notes and opinions are used to aid another expert in reaching an opinion. *People v. Wagener*, 196 Ill. 2d 269, 275 (2001). Privilege is not waived merely because the defendant brings forth an insanity defense. See *id.* The State raises two additional arguments as to why it should still be entitled to utilize Stapleton's testimony. First, defendant asserted an insanity defense, enabling the State to use his fitness evaluations, which were the bases of Stapleton's sanity report. Second, the State was entitled to retain its own expert and compel another sanity evaluation, and it asserts that it would have requested Stapleton evaluate defendant, thus it would have received her report when it asked her to conduct an evaluation on its behalf.

¶ 29    The State argues that because Stapleton based her sanity report on her fitness evaluations, which then became admissible when defendant notified the State of his intent to raise an insanity defense, it was entitled to view the sanity report. Generally, fitness evaluations are inadmissible at trial. 725 ILCS 5/104-14(a) (West 2022). However, if the defendant raises an insanity defense, those evaluations then become admissible. *Id.* We do not disagree with the State that it could use

10

the fitness evaluations and question Stapleton regarding defendant's fitness evaluations. Stapleton's sanity report, however, is not solely based on the fitness evaluations and includes observations and opinions related to her October 22, 2022, attempted sanity interview. Moreover, the standards regarding sanity and fitness require two different analyses and can result in two different opinions. See, *e.g.*, *People v. Nichols*, 70 Ill. App. 3d 748, 753-54 (1979) ("the standards for competency to stand trial and sanity at the time of the offense are different"); *People v. Burnett*, 2016 IL App (1st) 141033, ¶ 48 ("it is a deeply rooted rule that the questions of fitness for trial and sanity concern different time frames and different standards"). Being entitled to use fitness evaluations does not then entitle the State to view that expert's opinion on sanity, even when the reports regarding the fitness evaluations were used to formulate that opinion, because those two determinations require different considerations. Stapleton's opinion regarding defendant's sanity at the time of the offense is protected by privilege, and the State may not become privy to that opinion if defendant does not call Stapleton as a witness on his behalf or otherwise waive the privilege. See *Knuckles*, 165 Ill. 2d at 139.

¶ 30    Finally, the State contends that any error in requiring defendant to disclose the report would have been harmless. When defendant raised insanity as a defense, that entitled the State to have another evaluation by its own expert. 725 ILCS 5/115-6 (West 2022). In receiving its own evaluation, the prosecuting attorney chooses the expert to conduct the evaluation. *Id.* Thus, the State would have asked Stapleton to conduct an evaluation, and it would have received her report anyway.

¶ 31    This argument is unpersuasive. The State's position rests on the idea that there would be no conflict or prejudicial effect to an expert first being hired by one party and then eventually being retained by the other. A medical expert working on behalf of the defendant, besides

11

conducting an interview and providing an opinion, effectively acts as a consultant to defense counsel. As consultant, the expert's goal is not only to determine defendant's mental state, but to explore the possibility and strength of an insanity defense. See *Knuckles*, 226 Ill. App. 3d at 719-20. Thus, Stapleton's obligations to defendant and her role as a consultant to the defense do not cease merely because she is not being called to testify at trial. There is no way for Stapleton to separate the confidential communications that occurred when working on behalf of defendant with the evaluation that would occur if the State asked her to conduct another evaluation. Because defendant never waived privilege and there is no way to separate those communications from Stapleton's opinion, it is entirely implausible that the State would be permitted to retain Stapleton as its expert after the defendant already retained her. To allow this to occur would undermine the principles of attorney-client privilege and would likely create a conflict for the appointed expert.

¶ 32    In sum, as *Knuckles* instructs, allowing the State to use Stapleton's sanity report against defendant when it was defendant who requested the report be generated would create a "chilling effect" on defendant's willingness to engage with mental health professionals employed by the county for fear that it would allow the State access to subsequent reports. See *Knuckles*, 165 Ill. 2d at 140 ("the defense would be inhibited from consulting with mental health professionals for fear of creating prosecution witnesses, and might not consult them even though professional assistance might be crucial to the case"). We recognize that Stapleton first acting as the State's witness for the fitness hearing before being appointed to conduct a sanity evaluation on defendant's behalf is less than ideal practice. However, the conversations that occur during a fitness evaluation are not privileged in the way the contents of a sanity evaluation are. Therefore,

12

once Stapleton was appointed to work on defendant's behalf to determine his sanity, the State could no longer retain her for the same purpose of providing an opinion on defendant's sanity.

¶ 33 Accordingly, we find that the circuit court erred in allowing the State to view and use Stapleton's sanity report against defendant as she was engaged to aid the defendant in preparation of his defense but was not being called as a defense witness to testify at trial. Nor should Stapleton have been permitted to testify for the State regarding that sanity report. This error was so prejudicial that it deprived defendant's right to a fair trial. See *id.* at 136. Thus, we must reverse and remand for a new trial. Because we reverse on these grounds, we need not consider the other issues defendant raises on appeal.

¶ 34 III. CONCLUSION

¶ 35 The judgment of the circuit court of Will County is reversed and remanded for proceedings not inconsistent with this order.

¶ 36 Reversed and remanded.

13

*People v. Watson*, 2024 IL App (3d) 230357

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 19-CF-555; the Hon. David M. Carlson, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Santiago A. Durango, and Dimitri Golfis, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, Thomas D. Arado, and Jamie L. Bellah, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |